[No. 27795. Department Two. April 4, 1940.]

A. B. LAYMAN et al., Respondents, v. ALFRED SWANSON et al., Appellants.[1]

[1]Reported in 101 P. (2d) 304.

*Sweeney & Haugland* and *B. H. Camperson,* for appellants.

*W. J. Daly,* for respondents.

JEFFERS, J.—This action was instituted by A. B. Layman and D. E. Walker, copartners, against Alfred Swanson and Anna Swanson, his wife, E. K. Hjelvik and Ethel Hjelvik, his wife, Elmer Swanson, Jay Swanson, and Walter Swanson, to recover the value of a gas donkey engine, and damages resulting from its conversion. Defendants, by their answer, denied that they converted the donkey engine, and alleged that they were in lawful possession of it at the time conversion is claimed. They further alleged that no demand for its return was made upon them.

Defendant Alfred Swanson died after this action was commenced, and on June 3, 1938, by order of court,

Anna Swanson, as executrix, was substituted as a party defendant for Alfred Swanson. Plaintiff D. E. Walker died after this suit was started, and on July 15, 1938, Velma Walker, as administratrix, was substituted as a party plaintiff for Mr. Walker.

Elmer, Jay, and Walter Swanson are sons of Alfred and Anna Swanson, and E. K. Hjelvik is their son-in-law.

The matter was heard by the court, and findings of fact were made and entered, which, in so far as material, state:

Finding No. 5. "That, on or about the 1st day of October, 1937, the plaintiffs were the owners of a gas donkey engine, situated upon United States lands in Jefferson county, Washington, which lands were being logged by defendant, Alfred Swanson."

Finding No. 6. "That, on or about the 10th day of October, 1937, the defendants, acting together, for the purpose of hindering and destroying plaintiffs' logging operations, which logging operations, and the particulars thereof, were well known to the defendants, and acting by force and violence against plaintiffs, converted and took possession of said gas donkey engine; and the defendants never, at any time, tendered said gas donkey engine to plaintiffs; that, as a proximate result of the aforesaid acts of the defendants, plaintiffs were compelled, and did discontinue and abandon their logging operations, and that defendants were, and they now are, in the wrongful possession of said gas donkey engine, to the damage of plaintiffs, in the sum of $575, no part of which has been paid.

"That, by reason of the conversion of said gas donkey, and the unlawful acts of defendants, thru force and violence, the plaintiffs lost 100,000 feet of saw logs of the reasonable value to plaintiffs, at the time of the conversion of said donkey engine, of the sum of $5.50 per thousand, or the total sum of $550."

Conclusions of law and judgment were entered in accordance with the findings of fact, after the denial

of a motion for judgment notwithstanding the decision, or in the alternative for new trial, and this appeal followed. Appellants' assignments of error are based on the refusal of the trial court to sustain appellants' motion for nonsuit at the close of respondents' case, on the entry of judgment for respondents, and the granting of excessive and speculative damages.

It is first contended by appellants that there was no conversion, because respondents, on October 10, 1937, were not entitled to the possession of the donkey engine.

It is undisputed that, on September 27, 1937, one J. R. Curry held an option contract under which he was entitled to log a certain piece of land belonging to the McCormick Lumber Company. This option expired on October 12, 1937. The timber to be logged was apparently some trees which had been left from former logging operations and were along the edge of a bluff not more than six or seven hundred feet from salt water. Curry had no funds with which to procure machinery to log this land, and so, after going with respondent Walker to the Swanson camp to look at the donkey engine in question, on September 27, 1937, he assigned to these respondents all his rights in and to his logging contract.

It is admitted that, at this time, Earl Kuhns was the owner of the donkey engine in question and certain appliances used in connection therewith in logging operations, which he had been using in connection with a contract he had with Alfred Swanson. Kuhns quit this job about September 18th, and left the donkey at the Swanson camp. Respondents went to see Kuhns about purchasing the donkey, and the three of them went up to the Swanson camp. Respondents looked at the engine, and Kuhns went over and talked to Elmer Swanson. On this occasion, Elmer Swanson,

his father, and some other man were present. As a result of this inspection, respondents and Kuhns, on October 1st, entered into a conditional sale contract, whereby Kuhns· agreed to sell to respondents the donkey engine and certain equipment for six hundred dollars, of which three hundred dollars was paid in cash, the balance to be paid in monthly installments of twenty-five dollars each.

It further appears from the testimony of respondents' witness that, on October 3rd, respondents again went to the Swanson camp for the purpose of getting the engine. However, they never reached the camp, but were stopped by Elmer Swanson and some of the other Swanson boys. Alfred Swanson was also present. The Swansons did not want respondents to take the engine, and after some argument, it was agreed that the Swansons could keep the donkey until the following Saturday, if they would then deliver it to Linger-Longer, where respondents were building a float.

It further appears from the testimony of Mr. Layman, that, on October 3rd, he told Elmer Swanson that they had a bunch of logs down there and would have to have the donkey on that date, as they had only a certain time in which to get their logs out. The testimony of appellant Elmer Swanson was to the effect that Kuhns told him he could use the donkey until he had finished the spar tree where the engine was located. Elmer Swanson did not specifically deny the statement of Mr. Layman, but said that he told them he might be able to finish in two or three days, or it might take longer. The testimony of Robert Swanson, Mr. Richtarich, a witness for appellant, and Bertha Cordes, who was working for appellants at the camp, was to the effect that Elmer was told by Mr. Kuhns that he could use the engine to finish the spar tree.

This purported conversation, however, was prior to October 3rd, when respondents contend it was agreed that Elmer could use the engine until Saturday, October 9th.

The engine not having been delivered to Linger-Longer, on Sunday, October 10th, respondents obtained a truck and, together with Kuhns, the Goodrich boys, and the Dennis boys, proceeded to the Swanson camp to get the engine. While they were trying to load the engine, Elmer Swanson and one Walter Skates came up. Elmer asked them to stop disturbing the logs and said he was going to call the sheriff. He sent Skates to call the sheriff. Sometime thereafter, appellant Hjelvik, Walter Swanson, and Jay Swanson came up to the scene. Hjelvik had a rifle, and so did Walter Swanson. Hjelvik attempted to get up on the donkey, and a scuffle ensued between him and respondent Walker, and the gun was taken away from Hjelvik. Sometime during the scuffle, Walter Swanson fired a shot into the donkey and this stopped the proceedings.

Walter Swanson and Hjelvik went up the road a little way, and sat down with the guns across their knees, and were there when State Patrolman Bolts arrived on the scene. He took the guns from these two men, and after listening to the contention of Elmer Swanson that there had been an attachment issued and that the engine could not be moved, and the claim of Layman that respondents had bought the engine, he suggested that things be left as they were until they could look at the records and see who was entitled to the engine. Sometime later, Sheriff Polk and his deputy, Brown, arrived, and the sheriff told Swanson that no attachment had been levied.

It appears that, sometime during the trouble, the truck which had been brought up to get the engine

had left. Sheriff Polk further testified that Elmer Swanson, referring to Kuhn's car, said: "If you want to get that car out of here, you better get it out of here pretty quick, because I am going to fall some trees across the road here." Mr. Brown testified that Elmer stated they could not take the donkey out, and that he was going to fall some trees across the road, so no one could take the donkey out. Brown further testified that, on October 12th, he went up to arrest Elmer Swanson, and found the gates to the Swanson logging works locked up, and some trees across the road; that, when he got up to where the engine was, Elmer Swanson and some men were doing some repair work on the engine.

Appellants denied that they intended to forcibly restrain respondents from taking the engine, but attempted to justify their actions on the theory that they thought it had been attached in a suit started by Alfred Swanson against Kuhns. Appellant Hjelvik and Walter Swanson testified that they took the guns up on this trip for the reason that Walter expected to go hunting, and Hjelvik said he always took his rifle with him when he went into the woods. Appellant Jay Swanson testified that he went up to the camp on the 10th, at the request of his father, Alfred Swanson, to assist in the work; that Walter Swanson had come after him in his car, and they had picked up Hjelvik and another man; that Walter had a .30 rifle, and Hjelvik a .22.

On this testimony, we think the court was warranted in finding that, on October 10th, respondents were entitled to the possession of the donkey engine.

We agree with the rule announced in 6 Am. Jur. 233, § 122, cited by appellants, to the effect that, where a bailee, by the terms of the bailment, is entitled to the possession of property as against the bailor, for a

definite period of time, this right is not affected by a transfer of the bailor's title, but we do not think the rule as announced above and in the cases of *J. H. & C. K. Eagle, Inc. v. Kunkle*, 278 Pa. 190, 122 Atl. 276; *Hart Enterprise Electrical Co. v. Stewart*, 168 So. (La. App.) 791; *Williams v. Redinger*, 179 Iowa 615, 161 N. W. 701; and *Cohen v. Felgenhauer Co.*, 162 N. Y. Supp. 306, is controlling herein.

Neither do we think the contention of appellants that there was only a qualified refusal to deliver herein, and that therefore conversion will not lie, can be sustained. While it does appear that Elmer Swanson contended that the engine had been attached, still, after he had been informed by the sheriff that no attachment had been made, it appears from the testimony of the sheriff and his deputy that Elmer stated he was going to fall some trees across the road, and it further appears from the testimony of deputy Brown that Elmer said they could not take the engine, and that, on the 12th of October, Brown found trees across the road, the gates locked, and Elmer and some of the other appellants repairing the engine. In the face of this testimony, we think the trial court was justified in finding this was an absolute, not a qualified, refusal to deliver. The authorities cited by appellants to sustain their contention that, where a refusal is not absolute, but is qualified, it will not serve as a sufficient basis for an action of conversion, are not applicable to the facts in this case.

That all the appellants are liable herein, on the theory that they assisted and aided in the conversion, see *Davin v. Dowling*, 146 Wash. 137, 262 Pac. 123.

It is next contended that the court had no basis upon which to fix the value of the donkey engine at $575. The evidence was conflicting, but from respondents' testimony, the court could well have found the

donkey engine was of the reasonable value of $575. It is true appellants' witnesses, including a Mr. Hayes, testified that the donkey was worth from $100 to $150, but we are not disposed to disturb the finding of the trial court.

It is next contended that there was no basis upon which the court could have determined damages for lost profits in the sum of $550. It appears from the testimony of respondents' witnesses that there was about 100,000 feet of merchantable timber on the tract purchased by respondents; that most of the timber was not over six hundred feet from the water, and respondents had the greater part of the timber felled, intending to put the donkey on a float which they had built and yard the logs into the water; that about eighty per cent of the logs would be No. 2's, with some No. 1's and No. 3's; that No. 3's were worth fifteen dollars, No. 2's, eighteen dollars, and No. 1's, twenty-five dollars a thousand; that, in view of the location of the logs, they could be put in the water for five dollars a thousand. There was also testimony to the effect that it would cost about twenty-five cents a thousand to raft these logs, and sixty-five cents a thousand to tow them.

The testimony of appellants' witnesses was to the effect that there was about 39,000 feet of poor stuff, of which about seventy-five per cent would grade as No. 3's. There was also testimony by appellants' witnesses to the effect that the expense of getting the logs into the water would be more than they were worth, and that they were not worth more than eleven dollars a thousand.

We think there was testimony here from which the trial court was justified in concluding that, on October 3rd, when the Swansons were given permission to use the donkey until the following Saturday, they knew

that it was necessary that respondents have this engine in order to get out their logs before October 12th, when their option expired. We are also of the opinion that there is testimony from which the trial court was justified in finding that the respondents were forcibly restrained from taking the donkey, and that, as a result thereof, they were unable to get their logs into the water prior to the expiration of their option. We are further of the opinion that there is testimony herein from which the court was justified in concluding that respondents had been damaged in the sum of six hundred dollars as a direct consequence of appellants' acts, and that the testimony was not indefinite and uncertain as to these damages, but was sufficiently definite to enable the court to arrive at a definite amount. See 8 R. C. L. 501, § 62; 26 R. C. L. 1148, § 63; 15 Am. Jur. 571, § 155.

■ Again, we agree that prospective profits may not be recovered where they are speculative, uncertain and conjectural. As typical of this class of cases, we refer to *Webster v. Beau,* 77 Wash. 444, 137 Pac. 1013, 51 L. R. A. (N. S.) 81, cited by appellants, which action was based upon the alleged failure to furnish goods to establish a trading store in Alaska, and resultant loss of profits. We stated:

"The contract contemplated the establishment of a future business in a remote and sparsely settled country, under dangerous and adverse conditions. It did not pertain to any existing business. Any loss of profits would necessarily mean the loss of such anticipated profits as might possibly be earned in the future from a business not yet created, installed or conducted."

We are of the opinion that the cases cited by appellants to the effect that prospective profits in a new and untried business are not recoverable, are not controlling in this case.

It is finally contended that respondents made no effort to procure another donkey engine; in other words, that they made no attempt to minimize their damage. It appears that respondents had no funds with which to procure other equipment, even if it had been available, and that they only had two days left under their contract. In view of these and other facts, we do not think the rule requiring one to minimize his damages, is a bar to respondents' recovery herein, in whole or in part. Had there been time within which, by the exercise of diligence, respondents might have procured other equipment to do the required work, the rule above announced might have been invoked against them.

The judgment is affirmed.

BLAKE, C. J., BEALS, STEINERT, and GERAGHTY, JJ., concur.

