248 P.3d 1067 (2011)
COLUMBIA PARK GOLF COURSE, INC., a Washington corporation, Respondent,
v.
CITY OF KENNEWICK, a municipal corporation in and for the State of Washington, Appellant.
No. 28357-7-III.
Court of Appeals of Washington, Division 3.
February 10, 2011.
Reconsideration Denied April 11, 2011.
*1069 Michael B. Tierney, Michael B. Tierney PC, Mercer Island, WA, Lisa M. Beaton, Attorney at Law, Kennewick, WA, for Appellant.
Nicholas D. Kovarik, Robert Allan Dunn, Dunn & Black PS, Spokane, WA, for Respondent.
SIDDOWAY, J.
¶ 1 We are asked in this case to set aside a jury's damage award to Columbia Park Golf Course Inc. (Columbia) following trial of its *1070 claims against the city of Kennewick (City) for breach of a development option agreement and the implied covenant of good faith and fair dealing. The City does not appeal the jury's determination that it breached the agreement but contends that the damages awarded were not recoverable as a matter of law, principally because at the time of the breach Columbia had not secured the permits, approvals, and agreements needed to succeed and because it characterizes the damages as future profits from a new business. The City also argues instructional error and that the trial judge should have ordered remittitur. We agree with the trial judge that Columbia presented substantial evidence in support of its claims and was entitled to submit its claim for presently measurable damages, not lost profits, to the jury. The trial court did not err in instructing the jury and substantial evidence supports the verdict. We affirm.

FACTS AND PROCEDURAL BACKGROUND
¶ 2 The federal government owns Columbia Park, 363 acres of recreational property located along the Columbia River shoreline. Federal ownership arose with construction of the McNary Lock and Dam, which created a reservoir whose shorelines are administered by the Secretary of the Army and the Army Corps of Engineers (Corps). The Secretary leased the park and other shorelines to Benton County, mandating that they be used for park and recreational purposes. After property comprising the park was annexed by the City, the Corps terminated its lease to Benton County and entered into a 50-year lease to the City. The Corps' master lease agreements with local governments require the governments and their sublessees to administer Corps property for park and recreational purposes, guided by an annual plan proposed by the local government and agreed to by the Corps. Among uses for the park that have been deemed suitable by the Corps for many years are as a golf course, as an overnight campground, and as a marina.
¶ 3 After the City acquired an interest in the park, it adopted development plans. A master development plan approved and adopted by the city council in February 2000 was controlling during all periods relevant to Columbia's claims. The master development plan was arrived at through a public process and was used as a guideline for decisionmaking about the park. The 2000 master development plan described a golf course and driving range that had long existed in the east end of the park, as well as plans for expanding and improving the course and course facilities.
¶ 4 Prior to 2000, city employees operated the golf course and driving range. In the late 1990s, the City issued a request for qualifications seeking a private "partner" to undertake improvements and privatize course operations. Columbia's controlling shareholder and president, Gary Long, Jr., submitted a proposal on its behalf. Mr. Long's background included management of retail golf stores, pro shops, driving ranges, and miniature golf courses. Mr. Long was also part owner of a software company that offered sales accounting and tracking software for golf course and food and beverage operations, including for golf course resorts offering recreational vehicle (RV) camping.
¶ 5 Columbia was selected by the City to be the developer and operator of improved golf course operations. In March 2000, the City and Columbia executed a 25-year sublease, which included an option to renew for 5 years. The property included in Columbia's sublease included the golf course, driving range, other itemized buildings and facilities, and additional property east and west of existing operations. For the first five years of the sublease, the parties agreed that Columbia would make $50,000 in capital improvements annually, in lieu of rent.
¶ 6 By September 2001, Columbia had constructed over $300,000 worth of improvements and decided it wanted to construct a larger clubhouse and restaurant than originally envisioned. It approached the City with revised plans and a request for lease modifications in its favor, to compensate for its increased investment. The City agreed to extend the term of the sublease through September 2031 with options running to January 2050, and to extend the period for capital improvements in lieu of rent to 10 years. *1071 It also agreed that Columbia would own any new improvements and to revise the assignment clause to make Columbia's rights more freely assignable. An addendum reflecting these changes was executed in April 2003 and approved by the Corps.
¶ 7 Columbia then encountered problems designing the larger building, given site constraints and difficulties relocating the driving range. Mr. Long was working through the driving range problems with city staff when he became interested in a second development opportunity in the park.
¶ 8 West of the golf course in the park was an old campground. The Corps' 1982 plan for the park identified the campground location as a problem, since physical constraints imposed by a levee resulted in a roundabout access route making the campground hard to find. By 2003 the amenities were outdated, the campground had lost money under city operation, and it had to be closed due to an inadequate septic system. The City's 2000 master development plan stated, with respect to the campground, that a "relocated recreational vehicle (RV) campground shall be designed, built and operated by a private owner on a long-term lease from the City" and in April 2004, the City published a request for qualifications seeking a qualified "partner" to design, construct, and operate a new RV campground. Ex. 1-M (Ex. C at 00038); Ex. 1-L. It received only one proposal, which was nonresponsive. At that point the City began exploring its own development of a campground, and favored finding a different location in the park.
¶ 9 In February 2005, Mr. Long, having heard of the lack of response, approached the City's director of parks and recreation, Cindy Cole, and expressed interest in submitting a proposal. He assumed the RV park would remain at the former campground location, but soon learned from Ms. Cole that the City preferred to move it. He was keenly interested in the potential of a resort-type RV park as part of the golf course redevelopment, if the City would agree to an RV park replacing the existing driving range. Columbia's leasehold was zoned open space and designated open space under the City's comprehensive plan, thereby allowing development of an RV park. Ms. Cole and other city staff believed the proposal had merit and city staff encouraged Mr. Long to include moorage for overnight boater camping. City staff began working with Mr. Long on the concept and design of an RV park, shoreline improvements, and boat moorage at Columbia's existing leasehold.
¶ 10 By August 2005, Columbia had prepared and provided the City with an initial development plan, and Columbia and the City entered into a development option agreement (DOA) "for the purpose of granting an exclusive option for the development of a recreational vehicle park, shoreline improvements and boat moorage within Columbia Park." Ex. 1-AA at 1. The agreement recognized Columbia's desire to "protect its substantial investment in the feasibility plan" and promised that during the term of the agreement the City would not "entertain or negotiate any alternate proposals for development of a recreational vehicle park, shoreline improvements, and boat moorage within Columbia Park." Id. at 1, 2. The DOA required Columbia to provide a project site plan, pursue site plan approval, and, upon final site plan approval, construct the development. The term of the DOA was six months, with options to extend. Through later exercise of the options, the agreement remained in effect through February 15, 2007.
¶ 11 The Corps indicated support for the revised development plan. Mr. Long and Ms. Cole had a predevelopment meeting with representatives of the Corps in September 2005 and Corps representatives confirmed that they considered campgrounds a normal shoreline use and even agreed to consider the RV park for a pilot program that would allow greater-than-30-day stays. A city staff report thereafter prepared for the planning commission stated that "the Corps of Engineers have expressed support of this project as a recreational use." Ex. 2-GG at 10684.
¶ 12 City staff and officials indicated support for the project. Columbia engaged engineers and submitted an application under the State Environmental Policy Act (SEPA), chapter 43.21C RCW, to the City in September *1072 2005 and an application for a shoreline substantial development permit and attached site plan in October 2005. City staff found that the RV park proposal met the intents and goals of the City's master development plan and the criteria established in the plan for an RV park, and recommended that the City's parks and recreation commission approve it with identified conditions. The parks and recreation commission voted to recommend approval of the permit application on March 9, 2006.
¶ 13 Notice of the application and the City's likely issuance of a mitigated determination of nonsignificance under SEPA was mailed to involved agencies and affected property owners on March 29, 2006. Only one letter of concernfrom a competing RV park ownerwas received by the end of the comment period.
¶ 14 The planning commission considered the permit application and City recommendation on April 17. The competing RV park owner who had submitted written opposition was the only citizen who spoke in opposition, objecting to lengths of stay longer than 30 days. Members of the planning commission nonetheless voted to recommend denial of the shoreline application.
¶ 15 The city council rejected the planning commission's recommendation and approved the shoreline permit at a May 2, 2006 meeting. Although the competing RV park owner and six other individuals spoke against the project, the council's Resolution 06-14, to approve the shoreline permit, passed 5-2. The permit issued by the City authorized Columbia "[t]o undertake the following development:. . . Renovations to the existing Columbia Park Golf Course, which includes removal of the existing driving range, and an expansion within the current lease area that will include an RV Park/Campground." Ex. 2-NN at 10655.
¶ 16 Opponents of the shoreline permit had 30 days within which to appeal approval of the permit to the Department of Ecology, during which time Mr. Long was notified Columbia could take no action on construction. Mr. Long's intended next step (following the appeal period) was to seek a building permit. No one appealed approval of the shoreline permit.
¶ 17 In the meantime, and during the eight months between Columbia's filing of its SEPA application and shoreline application approval, another development proposal was presented to the City. In November 2005, city representatives met with Aaron Beasley, representing Tri-River Sports Facilities Inc. (Tri-River Sports), who proposed to develop portions of the park located in the cities of Kennewick and Richland as a multipurpose community center, to include an RV park and boat docks. At the time of Mr. Beasley's December 2005 meeting with officials of the City and Richland, he projected revenues for the first year of $22 million, increasing to $25.5 million by 2008.
¶ 18 Tri-River Sports and the City entered into their own development option agreement (Tri-River Sports DOA) in February 2006. By the terms of that DOA, Tri-River Sports agreed to develop a site plan for a multipurpose community center in the west end of the park and the City agreed not to entertain alternate proposals for a multipurpose community center in that area.
¶ 19 Evidence at trial revealed that the City recognized as early as November 2005 that its dealings with Tri-River Sports were or might be inconsistent with the promises made in the Columbia DOA. In early May 2006, about a week after the council approved Columbia's shoreline management permit, city attorney John Ziobro sent a memo to city manager Bob Hammond addressing the City's obligations under the DOA. While the memo can be, and was, characterized by the City as a good faith assessment of the City's legal obligations to Columbia, it can also be, and was, characterized by Columbia as a veiled road map to actions which, if taken, could prevent Columbia's proposed development from coming to fruition. Among actions identified by the memo that would prevent completion of an RV park by Columbia were to (1) refuse to extend the development option agreement, which would open the door to competition from another developer (arguably referring to Tri-River Sports); (2) give Columbia notice before sublease negotiations that the *1073 City is concerned about the project; or (3) propose new lease terms.
¶ 20 Approximately a month after the council approved Columbia's shoreline permit and several weeks after Mr. Ziobro's memo, Mr. Hammond requested a meeting with Mr. Long, at which he, the mayor, and other city officials told Mr. Long and two of his investors that the RV park was "`just not going to happen'" in Columbia's existing leasehold. Report of Proceedings (RP) at 184. Mr. Long later testified that the announcement left him "numb." RP at 186. He asked Mr. Hammond whether the City's position had anything to do with Tri-River Sports. According to Mr. Long, Mr. Hammond deflected the question but at the same time insisted that "`we're pretty good at solving problems.'" Id. At a city council meeting that night, the council voted to discontinue consideration of an RV park in Columbia's existing leasehold, but indicated the City's willingness to explore Columbia's development of an RV park at another location.
¶ 21 On June 13, Tri-River Sports presented its park development proposal to the joint city councils of the City and Richland, including a scale model and a video showing an RV park and boat moorage. Following the meeting, the scale model of the proposed Tri-River Sports development was placed on display in the lobby of the Kennewick City Hall.
¶ 22 For a number of months thereafter, Columbia and the City attempted to negotiate development of an RV park and restaurant at locations west of the golf course, including locations Mr. Long viewed as desirable. But siting the RV park at a location other than Columbia's existing leasehold required entry into a new leaseand terms could never be reached, for reasons that were disputed. At trial, Mr. Hammond could not recall any particular disagreements that prevented lease of another location to Columbia, other than to say that upon consulting with Mr. Ziobro and other city staff, he believed lease terms expected by Columbia were "too sweet" for the City to consider legal. RP at 581. Columbia contended that city staff intentionally held out for onerous lease terms in an effort to avoid a conflict with Tri-River Sports by killing any deal with Columbia.
¶ 23 During the period Columbia attempted to negotiate for a location west of the golf course, the City continued to correspond internally over its legal exposure. Among exhibits admitted at trial was an October 2006 memo from Mr. Ziobro to Mr. Hammond and Russ Burtner, the City's executive director of municipal services, addressing Tri-River Sports' legal demands and threats, in which Mr. Ziobro observed that Tri-River Sports appeared unwilling to engage in a resolution that would allow Columbia to locate an RV park or restaurant in the west end of the park. Mr. Ziobro opined in the memo that "[i]n some respects, the [Columbia] Agreement is the stronger of the two Agreements," and stated that "[i]t very well could be that the City breached [Columbia's] Agreement by entering into the Tri-River Agreement." Ex. 3-S at 7, 2. But he also noted that, as compared to the threats being made by Tri-River Sports, "there does not appear to be the same imminent threat of litigation with the [Columbia] group." Id. at 7.
¶ 24 In January 2007, city staff recommended that the city council deny Columbia's next request for extension of its DOA. In response, Columbia withdrew its request for an extension of the agreement and filed suit against the City in February 2007.
¶ 25 In its complaint filed in Benton County, Columbia alleged that the City breached the DOA and its duties to Columbia in two ways: by entertaining the Tri-River Sports project in violation of the exclusivity provision, and by revoking its agreement that Columbia could construct an RV park within its existing leasehold. It asserted contract, tort, and restitution theories, as well as a claim under 42 U.S.C. § 1983. The City removed the action to federal court. In March 2008, the federal court dismissed Columbia's tort claims, without prejudice, for failing to comply with the notice requirements of chapter 4.96 RCW. The parties later filed cross-motions for summary judgment on the remaining claims and the federal court granted the City's motion to dismiss Columbia's federal and restitution claims. It refused to dismiss Columbia's contract *1074 claims, finding that issues of fact required trial. After dismissing the federal claims, the federal court declined to exercise continuing supplemental jurisdiction and remanded the contract claims to state court.
¶ 26 Following remand the City again moved for summary judgment dismissing Columbia's complaint, and the state court, like the federal court, refused to dismiss the contract claims.
¶ 27 The contract claims were tried to a jury over 10 days in June 2009. By special verdict, the jury found that the City breached the DOA and the covenant of good faith and fair dealing. The jury awarded Columbia damages of $3 million. The City's motion for judgment as a matter of law, a new trial, or remittitur of the damages amount was denied, and this appeal timely followed.

ANALYSIS
¶ 28 The pivotal issue on appeal is damages. While the City contested Columbia's claim that it breached the DOA and its duty of good faith and fair dealing, it confines its appellate challenge to issues bearing on the substantial damage award.
¶ 29 As the federal court first noted in its November 2008 order, it is undisputed that the DOA is an enforceable contract. Clerk's Papers (CP) at 4196. Cities often enter such agreements with potential developers of public land to help the project proponents gather financial resources for environmental and technical studies, seek grants or permits, and test interest among prospective commercial tenants. City of Santee v. County of San Diego, 186 Cal.App.4th 55, 63, 111 Cal. Rptr.3d 47 (2010). The agreement is an objective manifestation of mutual assent to definite terms, supported by mutual promises as consideration. See Keystone Land & Dev. Co. v. Xerox Corp., 152 Wash.2d 171, 176, 94 P.3d 945 (2004); King v. Riveland, 125 Wash.2d 500, 505, 886 P.2d 160 (1994). The evidence supports the jury's conclusion that the City breached the DOA and the covenant of good faith and fair dealing.
¶ 30 The City accepts these factual determinations but nonetheless assigns error to rulings by the trial court falling into three categories: it argues first, that Columbia's claims for breach of the DOA and resulting damages should have been dismissed by summary judgment, by directed verdict, or by posttrial motion on grounds that damages were not recoverable as a matter of law; second, that the trial court failed to instruct the jury on the "new business rule" and improperly denied the City's motion for directed verdict and new trial based on "new business rule" issues; and third, that the court erred in denying the City's motion for remittitur.

I. RECOVERY OF DAMAGES, INCLUDING EXPECTATION DAMAGES
¶ 31 The City contends that damages based on the development contemplated by the DOA were not recoverable as a matter of law because Columbia never secured, and the Corps therefore never approved, a modified sublease substituting a right to operate an RV park for Columbia's original obligation to operate a driving range. The City moved on this basis for summary judgment dismissal of Columbia's contract claims, later for a directed verdict and, following the jury's verdict, for judgment as a matter of law. Ordinarily we will not review an order denying summary judgment after a trial on the merits, but "we will review such an order if the parties dispute no issues of fact and the decision on summary judgment turned solely on a substantive issue of law." Univ. Vill. Ltd. Partners v. King County, 106 Wash. App. 321, 324, 23 P.3d 1090, review denied, 145 Wash.2d 1002, 35 P.3d 381 (2001). The City's challenge on appeal is only to the trial court's decision on this issue of law. Reply Br. of Appellant at 6.
¶ 32 We review issues of law de novo. In reviewing denial of a CR 50(a) motion for judgment as a matter of law, we apply the same standard as the trial court, considering the evidence in the light most favorable to the nonmoving party. Goodman v. Goodman, 128 Wash.2d 366, 371, 907 P.2d 290 (1995). If the basis relied upon for a motion for new trial under CR 59 is a disputed issue of law, the standard of review is de novo. Cox v. Gen. Motors Corp., 64 Wash.App. 823, 826, 827 P.2d 1052 (1992).

*1075 Evidence of City and Corps Agreement to Substitute Operation of an RV Park for the Driving Range

¶ 33 Columbia's principal response to the City's argument is that the City and Corps had, by words and action, already approved modification of its sublease to allow development of an RV park. We agree there was evidence from which the jury could find that while further design and construction approvals would be needed from the City and the Corps, no further modification of the sublease was required.
¶ 34 As of 2005, Columbia held a 50-year sublease to the golf course and environs, so it had possession of the land, on terms that had already been agreed. Its property was zoned for development as an RV park and development of an RV park was an established objective of the Corps and the City's comprehensive plan and 2000 master development plan. The parties' only dispute was whether Columbia was strictly obliged by its sublease to operate a driving range or had secured agreement that it could substitute operation of an RV park, subject to compliance with the DOA. The trial judge, and before him, the federal court, viewed this as an issue for the jury.
¶ 35 The City presented evidence that in the spring of 2006 a number of city officials and staff expressed their belief or assumption that the sublease would have to be renegotiated before Columbia replaced the driving range with an RV park, but Columbia presented countervailing evidence. First was the DOA itself, which acknowledged Columbia's development plan substituting an RV park for the driving range, granted exclusive rights to Columbia to develop an RV park, and even required Columbia to develop the RV park once the permitting and approval process was completed. Next was the city council's adoption of Resolution 06-14, approving Columbia's site plan and granting a shoreline substantial development permit that allowed Columbia to undertake renovation "which includes removal of the existing driving range, and an expansion within the current lease area that will include an RV Park/Campground." Ex. 2-NN at 10655; Ex. 2-II; RP at 175, 1395. The DOA and Resolution 06-14 made no mention of any need to modify Columbia's sublease, even though both appear to have called out other required applications, requests, approvals, and conditions.
¶ 36 The City argued that city officials might have expected additional rent in exchange for allowing development of an RV park but this, too, was contradicted by Columbia's evidence. The city campground operation shut down in 2003 had been a losing venture and the City's 2004 request for qualifications for an RV park developer had no qualified takers. Columbia would be giving up driving range revenue and incurring an additional $1 million capital investment in order to develop the desired RV park. Mr. Long testified that the only change of sublease terms that was ever raised in connection with the RV park substitution was when he spoke to Ms. Cole and Mr. Burtner in the spring of 2005 about revising the sublease in Columbia's favor, by extending the rent-free period for Columbia's projected $1 million capital investment in the RV park; Mr. Long testified he later dropped that request. Mr. Long testified that by May 2005 he agreed with Ms. Cole and Mr. Burtner that no lease modification would be required, an understanding he believed he had confirmed by his transmittal of the proposed DOA, stating "I believe that it covers all of the points discussed in our prior meeting." Ex. 1-T at 06362; RP at 154, 158-60. When examined, Mr. Hammond admitted that the City never identified to Mr. Long what any new lease terms might be. RP at 463-64.
¶ 37 Finally, in May 2006, city staff included the planned substitution of the RV park for the driving range in its annual management plan submitted to the Corps, thereby arguably incorporating the change into Columbia's sublease since the sublease was expressly subject to the annual management plan agreed between the City and the Corps.
¶ 38 The City does not challenge this evidence supporting Columbia's position that agreement had been reached to substitute an RV park for the driving range, but argues that because the sublease contains an integration clause Columbia could not make the substitution without securing written modification *1076 of the sublease, signed by the City. Br. of Appellant at 7.
¶ 39 The City overstates the importance of the sublease clause requiring written modification. It is well settled in Washington that "`a contract may be modified or abrogated by the parties thereto in any manner they choose, notwithstanding provisions therein prohibiting its modification or abrogation except in a particular manner.'" Pac. Nw. Group A v. Pizza Blends, Inc., 90 Wash. App. 273, 278, 951 P.2d 826 (1998) (quoting Kelly Springfield Tire Co. v. Faulkner, 191 Wash. 549, 555, 71 P.2d 382 (1937)); and see Family Med. Bldg., Inc. v. Dep't of Soc. & Health Servs., 104 Wash.2d 105, 702 P.2d 459 (1985) (writings short of formal amendment or modification of a long-term lease, taken together with the original lease, satisfy the statute of frauds).
¶ 40 When viewed in the light most favorable to Columbia, there was substantial evidence from which the jury could find that until the council announced in June 2006 that it would no longer allow the RV park to be located within Columbia's existing leasehold, the City and the Corps had agreed to the substitution, subject to Columbia's satisfaction of terms and conditions in the DOA.

Availability of Damages for Breach of a "Contract to Negotiate"
¶ 41 Because Columbia sued for breach of the DOA, not the sublease, the status of agreement on the sublease was not a basis for foreclosing damages entirelyeven if it might be relevant to the nature and extent of damages caused by the City's breach of the DOA. Generally, a party injured by breach of contract is entitled (1) to recovery of all damages that accrue naturally from the breach and (2) to be put into as good a pecuniary position as he would have had if the contract had been performed. Eastlake Constr. Co. v. Hess, 102 Wash.2d 30, 39, 686 P.2d 465 (1984) (citing Diedrick v. Sch. Dist. 81, 87 Wash.2d 598, 610, 555 P.2d 825 (1976)). To recover, the plaintiff has the burden of proving that the defendant breached the contract, that the plaintiff incurred actual economic damages as a result of the breach, and the amount of the damages. CP at 5185 (Instruction 25); Ford v. Trendwest Resorts, Inc., 146 Wash.2d 146, 165 n. 7, 43 P.3d 1223 (2002) (Chambers, J., dissenting). Damages are not recoverable for loss beyond an amount that the evidence permits to be established with reasonable certainty. Kadiak Fisheries Co. v. Murphy Diesel Co., 70 Wash.2d 153, 167, 422 P.2d 496 (1967).
¶ 42 Preliminarily, we note that the trial judge found the DOA to be a "contract to negotiate," as that term is used in Keystone, 152 Wash.2d at 171, 94 P.3d 945. CP at 4895-96. The damages recoverable for breach of a contract to negotiate is an undecided issue in Washington. In Keystone, our Supreme Court answered certified questions whether Washington contract law recognized and would enforce an agreement to negotiate a future contract and, if so, what would be the proper measure of damages for breach. The court provided an answer only to the first question, specific to the facts of the Keystone case.[1] The court declined to reach the question of damages, which it and the Ninth Circuit Court of Appeals (the federal appellate court had certified the questions) implicitly recognized as an open one. See Keystone Land & Dev. Co. v. Xerox Corp., 353 F.3d 1093, 1098 (9th Cir.2003).
¶ 43 The City cites no authority for its position that ordinary contract damage principles do not apply and that the trial judge should have denied damages entirely and dismissed Columbia's claim. While some jurisdictions have limited damages recoverable for breach of a contract to negotiate, we have identified none that have foreclosed damages entirely where a breach has been established.
¶ 44 Those jurisdictions that limit damages for breach of a contract to negotiate *1077 restrict a plaintiff to reliance damages, on the basis that there can be problems of proof as to the fact or amount of expectation damages. Cf. RESTATEMENT (SECOND) OF CONTRACTS § 352, cmt. a, § 349, illus. 1, 2, and 3 (1981) (when a plaintiff is unable to prove expectation damages with reasonable certainty, it may recover loss based on its reliance interest). But we find no basis in Washington law to adopt a special rule that always forecloses the usual expectation measure of damagesessentially a conclusive presumption that expectation damages can never be proved with reasonable certaintywhen a longstanding "reasonable certainty" requirement already guards against speculative awards. Kadiak Fisheries, 70 Wash.2d 153, 422 P.2d 496; and cf. Seattle First Nat'l Bank, N.A. v. Siebol, 64 Wash.App. 401, 408, 824 P.2d 1252, review denied, 119 Wash.2d 1010, 833 P.2d 386 (1992); Farm Crop Energy, Inc. v. Old Nat'l Bank of Wash., 109 Wash.2d 923, 941, 750 P.2d 231 (1988) (Callow, J., dissenting) (rejecting a strict limitation of recovery to reliance damages in promissory estoppel cases and allowing expectation damages where established).
¶ 45 Better reasoned authority from other jurisdictions supports applying usual contract principles, recognizing that where there is not reliable evidence of a final agreement (or, as in this case, the final project) a plaintiff might be unable to prove expectation damages with the required certainty and be left to reliance damages. In Venture Associates Corp. v. Zenith Data Systems Corp., 96 F.3d 275, 278-79 (7th Cir.1996), Judge Posner explained why a plaintiff shoulddepending on the evidencebe entitled to recover damages measured by the final agreement contemplated by the parties:
Damages for breach of an agreement to negotiate may be, although they are unlikely to be, the same as the damages for breach of the final contract that the parties would have signed had it not been for the defendant's bad faith. If, quite apart from any bad faith, the negotiations would have broken down, the party led on by the other party's bad faith to persist in futile negotiations can recover only his reliance damagesthe expenses he incurred by being misled, in violation of the parties' agreement to negotiate in good faith, into continuing to negotiate futilely. But if the plaintiff can prove that had it not been for the defendant's bad faith the parties would have made a final contract, then the loss of the benefit of the contract is a consequence of the defendant's bad faith, and, provided that it is a foreseeable consequence, the defendant is liable for that loss-liable, that is, for the plaintiff's consequential damages. The difficulty, which may well be insuperable, is that since by hypothesis the parties had not agreed on any of the terms of their contract, it may be impossible to determine what those terms would have been and hence what profit the victim of bad faith would have had. But this goes to the practicality of the remedy, not the principle of it.
(Citations omitted.) The weight of authority from other jurisdictions is in accord. See Logan v. D.W. Sivers Co., 343 Or. 339, 169 P.3d 1255, 1265-66 (2007) (Kistler, J., concurring in part and dissenting in part) and cases cited therein. Even more so is the trend of authority. Professor E. Allan Farnsworth, whose treatise on contracts and other publications were once relied upon as authority for rejecting expectation damages in cases such as this, later changed his position. Logan, 169 P.3d at 1266 nn. 5, 6.[2]; and see Fairbrook Leasing, Inc. v. Mesaba Aviation, Inc., 519 F.3d 421, 429 (8th Cir.2008) (questioning whether expectation damages would be foreclosed in a jurisdiction generally foreclosing expectation damages "if it can be discerned what agreement would have been reached").
¶ 46 Under Judge Posner's analysis, the alternative reliance damage measure would be used only "[i]f, quite apart from [the breach], the negotiations would have broken down." Venture Assocs., 96 F.3d at 278. In the trial below, however, the City staked its defense on nothing more than the theoretical possibility that agreement on development *1078 would have broken down, while Columbia presented substantial evidence that until the Tri-River Sports opportunity became a distraction, the path to its project completion appeared clear and problem-free. It has been argued that if a party wants to avoid paying expectation damages on the basis that final agreement was unlikely, it should offer evidence of that unlikelihood. Professor Eisenberg, discussing an explicit contract to negotiate in good faith, states:
Where such a commitment is part of a bargain, the injured party should be awarded expectation damages. Of course the deal might have broken down even if the other party had negotiated in good faith. However, because that party's wrongful acts made it impossible to determine what would have happened if she had acted in good faith, she should bear the burden of proving the deal would have broken down even if she had so acted.
Melvin Aron Eisenberg, The Emergence of Dynamic Contract Law, 88 CAL. L.REV. 1743, 1809 (2000).
¶ 47 A rule depriving parties like Columbia of the customary measure of damages ignores the reasonable motivation of contracting parties and is likely to discourage qualified parties from entering into development agreements with local governments in Washington. The purpose of damages in a breach of contract action is "`not the mere restoration to a former position, as in tort, but the awarding of a sum which is the equivalent of performance of the bargainthe attempt to place the plaintiff in the position he would be in if the contract had been fulfilled.'" Rathke v. Roberts, 33 Wash.2d 858, 865, 207 P.2d 716 (1949) (emphasis omitted) (quoting McCORMIK ON DAMAGES 560, § 137). It is hard to conceive of a talented developer who would agree to invest meaningful capital and effort into an 18-month or longer project knowing that the local government had a right to breach with impunity at any time and compensate the developer with nothing more than reliance damages. A development partner willing to do business on those terms is probably not a development partner worth having. A local government concerned about unpredictable liability can negotiate a cancellation fee of the sort often agreed in the private sector, ensuring the developer some premium if the project is abandoned but capping the local government's exposure should there later be good reasons to terminate a project or relationship. See Sierra Club v. Franklin County Power of Ill., LLC, 546 F.3d 918, 934 (7th Cir.2008) (quoting Venture Assocs., 96 F.3d at 278).
¶ 48 Damages in this case were properly determined by the jury. The constitution consigns to the jury the ultimate power to weigh the evidence and determine the facts, and the amount of damages in a particular case is an ultimate fact. James v. Robeck, 79 Wash.2d 864, 869, 490 P.2d 878 (1971). Whether a plaintiff has proved his loss with sufficient certainty is likewise generally a question of fact. In the context of a contract to purchase, the Washington Supreme Court has held, "`It is often said that, once the buyer establishes the fact of loss with certainty (by a preponderance of the evidence), uncertainty regarding the amount of loss will not prevent recovery. Thus, a buyer will not be required to prove an exact amount of damages, and recovery will not be denied because damages are difficult to ascertain.'" Lewis River Golf, Inc. v. O.M. Scott & Sons, 120 Wash.2d 712, 717-18, 845 P.2d 987 (1993) (quoting Anderson, Incidental and Consequential Damages, 7 J.L. & Com. 327, 395-96 (1987) for this "accepted rule of law").
¶ 49 The trial judge properly denied the City's several motions to dismiss Columbia's claims.

II. REASONABLE CERTAINTY AND THE "NEW BUSINESS RULE"
¶ 50 The real issue that loomed for Columbia in this case, particularly where the RV park and restaurant could be characterized as a new business, was whether damages from hoped-for future operations were too speculative. The "new business rule" ordinarily prevents an unestablished business from recovering lost profits as damages for breach. Kaech v. Lewis County Pub. Util. Dist. No. 1, 106 Wash.App. 260, 276, 23 P.3d 529 (2001), review denied, 145 Wash.2d 1020, *1079 41 P.3d 485 (2002). Profits for a new business are generally "`too speculative, uncertain, and conjectural to become a basis for the recovery of damages.'" Id. (quoting No Ka Oi Corp. v. Nat'l 60 Minute Tune, Inc., 71 Wash.App. 844, 849, 863 P.2d 79 (1993), review denied, 124 Wash.2d 1002, 877 P.2d 1287 (1994)). Such damages may be recovered, however, if a reasonable estimate can be made by analyzing market conditions and profits of substantially similar businesses. Farm Crop Energy, 109 Wash.2d at 928, 750 P.2d 231.

Nature of Columbia's Damage Claim
¶ 51 Evidently recognizing a risk, Columbia elected to forego any claim for lost profits. Instead, it contended that the bundle of rights it had acquired by the time of the City's breach (its 50-year lease, its shoreline permit, its approved site plan, and its exclusivity agreement, all associated with an exceptional recreational property) was assignable and that a market existed for such development rights. Columbia asked the jury to award it the market value of this asset it claimed was destroyed. The 2003 addendum to the sublease supported Columbia's position, since it reflected a modification making it easier for Columbia to sell and assign its rights, and even required a substantial payment to the City in the event Columbia assigned those rights prior to 2013.
¶ 52 The way Columbia valued the assetby applying a discount rate to its projected profits and arriving at a price that an investor would payparallels the method by which it would have proved lost profits, to be sure.[3] But while a "lost asset" measure may still be challenged as insufficiently certain to be submitted to the jury, it is more likely to survive the challenge because it is more susceptible to cross-examination and reliable countervailing evidence: it exists in a market, at a known point in time. With a lost asset damage claim, the City was not required to challenge facts hypothesized to exist decades after the 2009 trial; it could challenge whether the alleged market for golf course opportunities existed at the time of the alleged breach in 2006 and, if it did, whether investors in that market would accept Columbia's projections as sufficiently reasonable and reliable, and whether they would arrive at a proposed price using the discount rate that Mr. Long testified was market.[4] Under the lost asset theory of damage, it is irrelevant whether Mr. Long's pro forma financial projections would have proved correct; what matters is only whether a market existed and whether a $2.5 to $3 million price would have been paid for the bundle of rights in that market. This is a distinction with a difference, and one that enables an injured party who holds a bundle of rights for which a market exists to avoid a "lost profits" problem by subjecting its damage measure to measurement, cross-examination, and countervailing evidence available at the time of trial. See, e.g., Schonfeld v. Hilliard, 218 F.3d 164 (2d Cir.2000); First Fed. Lincoln Bank v. United States, 518 F.3d 1308 (Fed.Cir.2008); and cf. RESTATEMENT, supra, § 348(3) & cmt. d (If a breach is of a promise conditioned on a fortuitous event and it is uncertain whether the event would have occurred had there been no breach, the injured party may recover damages based on the value of the conditional right at the time of the breach. The value of that right must itself be proved with reasonable certainty, as it may be if there is a market for such rights.).

Alleged Instructional Error
¶ 53 The City nonetheless assigns error to the trial court's refusal to instruct on the "new business rule" as a limitation on the recovery of lost profits. The City proposed three instructions: its originally proposed instructions *1080 D-14 and D-15 and an unnumbered alternative later submitted with a pocket brief. CP at 4985-86, 5141. However, the City's proposed instruction D-14 foreclosed any award of net profits, even if reasonably certain. Its proposed D-15 and the alternative submitted with its bench brief both required testimony by an expert witness as a condition to recoverytestimony that Columbia did not present and that is not required by Washington law. Tiegs v. Watts, 135 Wash.2d 1, 954 P.2d 877 (1998) (testimony and exhibits offered by and through the plaintiffs, experienced operators, provided a reasonably certain basis for a lost profits damage claim).
¶ 54 A court is not required to give an instruction that is erroneous in any respect or where it is reasonably possible to misstate the law. Tennant v. Roys, 44 Wash.App. 305, 310, 722 P.2d 848 (1986). And where Columbia was not seeking lost profits, the giving of any instruction on profits as damages would indicate to the jury that the trial judge thought there was evidence on the issue and that limitations applicable to lost profits claimed by a new business should apply. Washington cases consistently hold that it is prejudicial error to submit an issue to the jury when there is no substantial evidence concerning it. Albin v. Nat'l Bank of Commerce of Seattle, 60 Wash.2d 745, 754, 375 P.2d 487 (1962).
¶ 55 The trial judge's proper instructions allowed the City to argue that Columbia was not entitled to recover speculative or conjectural damages. His instruction on the measure of damages limited recovery to "actual damages," defined as "those losses that were reasonably foreseeable, at the time the contract was made, as a probable result of a breach," and he instructed that in calculating damages, the jury "should determine the sum of money that will put [Columbia] in as good a position as it would have been in if both [parties] had performed all of their promises under the contract." CP at 5185-86 (Instruction 25). The trial judge did not abuse his discretion in rejecting the City's erroneous and prejudicial proposed instructions.
¶ 56 The judgment is affirmed.
¶ 57 The remainder of this opinion has no precedential value. Therefore, it will be filed for public record in accordance with the rules governing unpublished opinions. RCW 2.06.040.
KORSMO, J., dissenting.
¶ 67 The courts of this state have not yet determined when parties can enter into an agreement that contemplates an additional future agreement, let alone the proper standard for awarding damages for breach of such agreements. Like the majority, I conclude that contracts that imply future negotiation will take place are valid. However, I would hold that only reliance damages are recoverable in cases of breach of those contracts. Expectation damages are too speculative to be awarded in this case and are inconsistent with Washington's "new business rule."

Contracts Requiring Future Agreement
¶ 68 Courts across the country, and commentators as well, are split on the enforceability of agreements that contemplate future agreements. See Generally, Alan Schwartz & Robert E. Scott, Precontractual Liability and Preliminary Agreements, 120 HARV. L.REV. 661 (2007); E. Allan Farnsworth, Precontractual Liability and Preliminary Agreements: Fair Dealing and Failed Negotiations, 87 COLUM. L.REV. 217 (1987).
¶ 69 Washington initially rejected the idea,[1] but subsequently put its toe in the water in Badgett v. Security State Bank, 116 Wash.2d 563, 807 P.2d 356 (1991). There the court rejected a claim that a bank had an obligation to continue negotiating modification of an existing loan agreement in the absence of a contractual position requiring it to do so. The court also stated that the *1081 contractual obligation to act in good faith relates only to existing contract terms and was not an obligation to negotiate further. Id. at 569-572, 807 P.2d 356.
¶ 70 The issue was squarely presented by Keystone Land & Development Co. v. Xerox Corp., 152 Wash.2d 171, 94 P.3d 945 (2004). There the court addressed certified questions from a federal court concerning whether Washington would recognize an agreement to negotiate a future contract under the circumstances presented by the case and, if so, what the measure of damages would be. Id. at 173-174, 94 P.3d 945. The court decided that there was no contract under the facts of the case and, thus, did not need to answer the question of damages. Id. at 179-180, 94 P.3d 945. In the course of its discussion, the court determined that it would not recognize agreements that merely called for the parties to agree in the future. Id. at 175-176, 94 P.3d 945. The court also noted, but did not analyze, "agreements with open terms." These agreements show the parties have agreed to be bound to key terms that will be supplied by courts or other authorities. Id. at 176, 94 P.3d 945.
¶ 71 Finally, the court discussed contracts to negotiate. These involve promises to behave in a particular manner while attempting to negotiate an ultimate agreement. Id. Typical promises include agreements to negotiate in good faith, or exclusively with each, or for a specific period of time. Id. The Keystone court found that Badgett supported a conclusion that "a specific course of conduct agreed upon for future negotiations is enforceable when it is contained in an existing substantive contract." Id. at 177, 94 P.3d 945. The court declined to decide if it would ever enforce a contract to negotiate because the parties had not created such a contract. Id. at 179, 94 P.3d 945. There was no objective manifestation of mutual assent. Id.
¶ 72 The development option agreement (DOA) signed here does not expressly require the parties to negotiate further, but it leaves so many issues open that further negotiations were implicitly required. The agreement granted Columbia Park Golf Course, Inc. (Columbia) "an exclusive option for the development of a recreation vehicle park, shoreline improvements and potential boat moorage being located with Columbia Park." DOA, at 1 (Ex. 1-AA). It was noted that Columbia desired to have an exclusive option to prepare a plan subject to city of Kennewick (City) approval. Id. The DOA required the developer to provide a development plan, pursue all necessary permits, and construct the development upon final site plan approval. Id. at 1-2. The City agreed to refrain from requesting or entertaining other development proposals dealing with recreational vehicle parks, shoreline improvements, or boat moorage within Columbia Park. It also was required to timely process all applications and permit requests. Id. at 2. The agreement would expire February 16, 2006, but was subject to three mutually agreeable six-month extensions of time. Id.
¶ 73 Noticeably missing from this barely three-page document, which was drafted by Columbia's counsel, is any express indication that the parties would be negotiating further, other than the fact that the parties explicitly were required to agree on a site plan. However, it is implicit that they had to negotiate further. The DOA did not include any terms for leasing the land for the new projects. Would the City share in profits, or would it simply charge a ground lease as it was doing for the golf course?[2] What obligation for maintenance and liability would the parties have? What about the federal government that actually owned the land? There also was an existing sublease between the City and Columbia that required it to maintain a driving range that would have to be moved or eliminated to make the new project work. The conclusion to be drawn is that while there was a project in the works, the terms of any future development still needed to be decided upon. The timing clause makes clear that neither party was bound to the project. Columbia was free not to go forward if the project failed to pencil out, and the City was free to let the option expire if it could not agree on the site location or other terms.
*1082 ¶ 74 In this circumstance, the reasonable interpretation is that the parties had a contractual obligation to negotiate further over the terms of the proposed development. I agree with the majority that this was a contract to negotiate further.[3]

Available Damages
¶ 75 The jury found that the City had breached its duty to exclusively deal with Columbia and its duty to act in good faith. The evidence amply supports those determinations. The question is what was the appropriate measure of damages?
¶ 76 If the law concerning contracts that require further agreement is unsettled, the issue of damages for breach of the agreement is even less certain. Among the states that permit contracts to negotiate, the majority appear to allow only reliance damages in cases of breach. See Brady v. State, 965 P.2d 1, 11 (Alaska 1998) (collecting cases), cert. denied, 526 U.S. 1026, 119 S.Ct. 1268, 143 L.Ed.2d 363 (1999). Expectation or consequential damages are permitted primarily in the Seventh Circuit, where that court has applied its ruling in Venture Associates Corp. v. Zenith Data Systems Corp., 96 F.3d 275 (7th Cir.1996), as the presumptive state law in other states in that circuit.[4]
¶ 77 The argument for reliance damages is that they make the nonbreaching party whole and avoid speculative claims for damages. Copeland v. Baskin Robbins U.S.A., 96 Cal.App.4th 1251, 1262-1263, 117 Cal. Rptr.2d 875 (2002). It is often an open question whether the parties would have entered into a subsequent agreement, let alone what the contents of that agreement would have been. Venture Assocs., 96 F.3d at 281 (Cudahy, J., concurring).
¶ 78 The primary argument for expectation damages appears to be that they are necessary to prevent bad faith. Venture Assocs., 96 F.3d at 278-280. "Bad faith is deliberate misconduct." Id. at 279. Permitting expectation damages is seen as an effective tool to prevent one party from trying to ruin another or extorting additional concessions from the other party. Id. at 278. Other judges have focused on the fact that consequential damages normally would flow from breach of a completed contract, so they ought to apply in this arena as well. Logan v. D.W. Sivers Co., 343 Or. 339, 169 P.3d 1255, 1266-1267 (2007) (Kistler, J., concurring in part and dissenting in part).
¶ 79 It is unclear why reliance damages are necessarily insufficient to make a party whole when there has been a breach of a contract to further negotiate.[5] There also are other reasons why this is an inappropriate policy for this state. Washington law already prohibits speculative damages for breach of contract. Larsen v. Walton Plywood Co., 65 Wash.2d 1, 16, 390 P.2d 677 (1964). Contracts to further negotiate that are as nebulous as this one require significant speculation about what terms would have been agreed upon and provide little basis beyond speculation for assessing damages for breach.[6]
¶ 80 An additional concern applicable to this case is Washington's new business rule. That doctrine, with some exceptions, generally prohibits claims for lost profits for most start up businesses. Id.; Layman v. Swanson, 3 Wash.2d 370, 379, 101 P.2d 304 (1940). It is a specific application of Washington's general rule that lost profits are only recoverable if there is a clear track record of profit for a specific business or industry. Larsen, 65 Wash.2d at 16-17, 390 P.2d 677. While Columbia eschewed a claim of "lost profits," a topic briefly discussed infra, our state policy against such speculative claims is informative in this context. For all of these *1083 reasons, awarding expectation damages for breach of an agreement to negotiate is not a good fit with existing Washington law.
¶ 81 There is still another policy reason to counsel against allowing expectation damages in this type of case. Agreements to negotiate are an important tool in dealing with complex transactions such as purchasing existing businesses or developing large parcels of land. Modern practices often require these transactions to be accomplished in stages while the parties learn more about each other and the nature of the transaction. Changes in market demand and financing requirements may require adjustments in negotiating stances. Numerous dynamic factors may come into play during the process. Copeland, 96 Cal.App.4th at 1262, 117 Cal. Rptr.2d 875; Farnsworth, supra, at 219-220. Because of developing information, it is easy to see that a party may want to change its position or even decline to continue negotiating.
¶ 82 In this circumstance, allowing expectation damages might well undercut usage of agreements to negotiate because a party that is not required to come to an agreement still can be faulted for not doing so. This disincentive is nicely stated by Judge Cudahy's concurring opinion in Venture Associates.
By adopting this principle, the majority certainly does create a disincentive for acting in bad faith in contract negotiations; but the adoption of the principle has another effect which is not so salutary. For we cannot lose sight of the fact that a contract is a deliberate agreement of the parties, frequently marked by certain formalities, establishing their own framework of rules to govern their relations. It seems to create a different paradox to foist the peculiar and special consequences of an agreement on parties who have not in fact agreed. In principle, it cannot be reasonably foreseeable that the parties will ever reach agreementlet alone what the terms of an agreement will be. Good faith is a necessary but not a sufficient condition of agreement. There are many perfectly legitimate reasons for negotiations to fail, even if good faith prevails.
As a matter of policy, I think it is undesirable to force agreement on parties under threat of a bad faith finding and subsequent imposition of consequential damages, the same sanction as would issue from actual agreement. Freedom not to contract should be protected as stringently as freedom to contract. The present case is an excellent example of how preliminary negotiations may be pyramided into a demand indistinguishable from a claim for breach of contract.
Reliance damages should be an adequate sanction for breach of an agreement to negotiate in good faith. Presumably, punitive damages could be assessed in egregious cases. With those sanctions, a good faith obligation is more likely to be enforced than if the matter could be escalated into what appears to be a breach of contract suit.
96 F.3d at 281.
¶ 83 Given existing Washington law and the mixed incentives created by the expectation damages, I would hold that breach of a contract to negotiate involving a new business venture should result only in reliance damages. In this case, I would remand for a trial solely on damages.
¶ 84 The same result should occur here even if this state adopts the Venture Associates test. There, the Seventh Circuit indicated that expectation damages would be available in cases of bad faith, which it defined as "deliberate misconduct." 96 F.3d at 278-279. The Seventh Circuit appears to equate the failure to bargain in good faith as the equivalent of acting in bad faith, stating "for it is only through bad faith that an agreement to negotiate in good faith can be violated." Id. at 280.
¶ 85 Washington's case law is less clear. The concept of bad faith has been raised in many different contexts. A dictionary definition has been applied in cases defining "bad faith" for the purpose of awarding attorney fees: "`actual or constructive fraud'" or a "`neglect or refusal to fulfill some duty ... not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive.'" State v. Sizemore, 48 Wash.App. 835, 837, 741 P.2d 572 (quoting *1084 BLACK'S LAW DICTIONARY 127 (5th ed. 1979)), review denied, 109 Wash.2d 1013, 1987 WL 503144 (1987).
¶ 86 The jury in this case was not instructed on the concept of "bad faith." Rather, it was directed to consider whether the City had fulfilled its obligation to act in "good faith." The trial court, following well-settled law, defined the duty to act in good faith for the jury in the following terms: "This duty requires the parties to cooperate with each other so that each may obtain the full benefit of performance." Clerk's Papers (CP) at 5175 (Instruction 15).[7] Nothing in this definition required the jury to consider the City's motives or reasons for not living up to its obligations.
¶ 87 On this record, it is not clear that the jury determined that the City acted in bad faith when it failed to live up to its duty of acting in good faith. While actual bad faith will constitute a breach of the duty to act in good faith, the converse is not necessarily true. The concept of good faith appears broader than the negative concept of bad faith, and a party can fail to act in good faith without necessarily acting for bad or sinister reasons.
¶ 88 Thus, even if Venture Associates states Washington law in this context, it is not clear that Columbia established an entitlement to expectation damages. For this reason, also, the jury award should be reversed.

Measure of Damages
¶ 89 While I conclude that expectation damages are not appropriate, a brief comment on the factual basis for the damages awarded in this case is still in order. Columbia calculated the value of its development interest by reducing the expected "revenue stream" to a present value figure.
¶ 90 Methinks the Bard correctly identified the problem at issue here: "What's in a name? That which we call a rose by any other word would smell as sweet." WILLIAM SHAKESPEARE, ROMEO AND JULIET act 2, sc. 2. Capitalizing projected profits and recasting them as the market value of the development opportunity is simply calling lost profits by another name.
¶ 91 If a claim of lost profits for a new business venture is too speculative to permit a jury to consider the issue, the same rule should apply to a business owner speculating that someone would buy his speculative profits. That should particularly be the case where the profits are based on an agreement of unknown terms. If there was a market for this DOA, potential investors could have been called to testify to that fact and its value to them. The evidence presented here was just Columbia claiming lost profits under another guise.

Conclusion
¶ 92 At its core, a contract to negotiate further is not necessarily a contract binding the parties to agree. The parties here were free to walk away from this venture. Under those circumstances, it is not proper to hold the breaching party to the terms of some agreement it never made. There was a duty to negotiate, not a duty to agree.
¶ 93 The proper measure of damages was Columbia's reliance costs, not expectation of profits from an expected agreement that was never made. I respectfully dissent.
NOTES
[1] In doing so, it stated that "[o]ur holding in Badgett [v. Sec. State Bank, 116 Wash.2d 563, 807 P.2d 356 (1991) ] supports a conclusion that, under Washington contract law, a specific course of conduct agreed upon for future negotiations is enforceable when it is contained in an existing substantive contract." Keystone, 152 Wash.2d at 177, 94 P.3d 945. It offered as examples of a "specific course of conduct," "negotiating in good faith, exclusively with each other, or for a specific period of time." Id. at 176, 94 P.3d 945.
[2] Among cases that relied on Farnsworth's former position are Goodstein Construction Corp. v. City of New York, 80 N.Y.2d 366, 604 N.E.2d 1356, 1361, 590 N.Y.S.2d 425 (1992) and Copeland v. Baskin Robbins U.S.A., 96 Cal.App.4th 1251, 1261 n. 26, 117 Cal.Rptr.2d 875 (2002).
[3] Washington cases accept capitalized net operating income using a market-derived discount rate as a measure of market value of an asset. See, e.g., Folsom v. County of Spokane, 106 Wash.2d 760, 725 P.2d 987 (1986).
[4] The financial projections relied upon by Mr. Long for his damage figure were not created for the litigation, they had been prepared prior to entry into the DOA and had been requested by the City to assess whether Columbia's proposed RV golf resort project was viable. Mr. Long's projected earnings supporting his $2.5 to $3 million damage figure were far less than the revenue that the jury heard was projected by Tri-River Sports for the Tri-River project.
[1] See Hedges v. Hurd, 47 Wash.2d 683, 689-694, 289 P.2d 706 (1955) (Donworth, J., dissenting); Sandeman v. Sayres, 50 Wash.2d 539, 541-542, 314 P.2d 428 (1957) ("[A]n agreement to do something which requires a further meeting of the minds of the parties and without which it would not be complete is unenforceable."); Pac. Cascade Corp. v. Nimmer, 25 Wash.App. 552, 556, 608 P.2d 266, review denied, 93 Wash.2d 1030 (1980).
[2] The existing lease spelled out the annual ground rent through January 1, 2050.
[3] If this is not an agreement to further negotiate, the DOA would not itself provide any basis for awarding expectation damages.
[4] Even at the time Venture Associates was written, the court recognized that there was very little state law on the topic and that it was the federal courts that were making state law on the topic. 96 F.3d at 277-278.
[5] Parties also are free to negotiate liquidated or other damages as part of the contract process.
[6] Some agreements requiring future negotiation may be certain in enough specific terms that the remaining terms can be easily calculated and damages determined. Contracts that leave open only the price are among that category. See, e.g., Farnsworth, supra, at 253-255.
[7] "Good faith" also has other definitions. In the instance of insurance contracts, where statutes and case law impose a duty of good faith dealing, the Washington Supreme Court once noted: "This fiduciary duty to act in good faith is fairly broad and may be breached by conduct short of intentional bad faith or fraud." Indus. Indem. Co. of the Nw., Inc. v. Kallevig, 114 Wash.2d 907, 916-917, 792 P.2d 520 (1990); accord Rizzuti v. Basin Travel Serv. of Othello, Inc., 125 Wash.App. 602, 105 P.3d 1012 (2005); Anderson v. State Farm Mut. Ins. Co., 101 Wash.App. 323, 329, 2 P.3d 1029 (2000), review denied, 142 Wash.2d 1017, 20 P.3d 945 (2001).