IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| SVN CORNERSTONE LLC, a Washington Limited Liability Company, | ) ) ) | No. 34692-7-III |
| Respondent, | ) ) ) | |
| v. | ) ) | |
| N. 807 INCORPORATED, a Washington corporation, d/b/a BERKSHIRE HATHAWAY HOMESERVICES FIRST LOOK REAL ESTATE; KENNETH M. LEWIS AND MICHELLE S. LEWIS, and the marital community composed thereto; HENRY SEIPP AND JANE DOE SEIPP, and the marital community composed thereof, | ) ) ) ) ) ) ) ) ) ) | UNPUBLISHED OPINION |
| Appellants. | ) | |

SIDDOWAY, J. — The defendants in the action below—a real estate brokerage

firm, its owners, and the marital community of an associate broker—appeal the trial

court's denial of their motion to compel arbitration. In denying the motion, the trial court reasoned that the parties did not intend the tort- and contract-based claims asserted by SVN Cornerstone LLC (Cornerstone) to be subject to the arbitration provision contained in the bylaws of the Commercial Brokers Association (CBA), to which all parties belong.

The plain language of the CBA's bylaws requires arbitration of all of Cornerstone's claims that seek, as damages, commissions or fees lost as a result of the acts of the defendants. Every indication in the briefing below and on appeal is that such damages are the principal relief Cornerstone seeks to recover through its claims. While we affirm the trial court's decision not to dismiss the complaint, we reverse its denial of the motion to compel arbitration.

## FACTS AND PROCEDURAL BACKGROUND

When Henry Seipp left his position as a real estate salesperson and associate broker for Cornerstone on April 20, 2015, he began working as a broker for Berkshire Hathaway HomeServices First Look Real Estate (Berkshire).[1] Before Mr. Seipp terminated his relationship with Cornerstone, it had developed a marketing package for the sale of the Timber Court Apartments (Apartments), owned by EZ Properties, LLC. According to Cornerstone, Mr. Seipp and other Cornerstone brokers had been trying to locate potential buyers for the Apartments for months, and had solicited purchase offers

---

[1] We refer to the corporation by its registered trade name; its legal name is N. 807 Incorporated.

2

for the Apartments from Royce Nelson as early as March 2015. Cornerstone asserts that acting on EZ Properties' behalf, it had negotiated initial terms of sale of the Apartments to Chris Nelson, a relative of Royce Nelson. Although Cornerstone appears to have created a listing, there is no evidence that a written listing agreement with EZ Properties was ever executed.

Two days after Mr. Seipp became associated with Berkshire, EZ Properties entered into an exclusive listing agreement with Berkshire for the sale of the Apartments. On the same day, EZ Properties accepted a $2,150,000 counteroffer for the Apartments from Mr. Nelson (Chris Nelson, the only "Mr. Nelson" we refer to hereafter). Cornerstone would later learn that on April 13, a week before Mr. Seipp changed affiliation, Mr. Nelson made a $1,900,000 purchase offer for the Apartments; that on either April 15 or 18, EZ Properties rejected Mr. Nelson's offer and made the counteroffer of $2,150,000;[2] and that Mr. Nelson accepted the counteroffer on April 20. The purchase and sale agreement that reflects these offers and the eventual agreement do not identify any listing or selling agent as having been involved.

Sometime in or before September 2015, Cornerstone learned of the sale of the Apartments and of Berkshire's exclusive listing agreement. It notified Berkshire that it was entitled to a three percent commission. Berkshire disagreed. For as-yet unexplained

---

[2] The signatory for EZ Properties initially dated the document April 15, 2015, but crossed that date out and wrote April 18, 2015.

3

reasons, on October 20, EZ Properties and Mr. Nelson entered into a new purchase and sale agreement for the sale of the Apartments for the reduced price of $2,100,000. This agreement named Berkshire as the listing firm and Mr. Seipp as the listing broker. EZ Properties and Mr. Nelson then rescinded the April 2015 purchase and sale agreement.

In April 2016, Cornerstone filed a complaint in Spokane County Superior Court against Berkshire; its owners, Kenneth and Michelle Lewis; and Mr. Seipp and his marital community. The complaint alleged that Mr. Seipp's activities in connection with the sale of the Apartments as an associate broker of Berkshire and his disclosure of information to that firm breached provisions of an independent contractor agreement he had signed with Cornerstone in 2010. It asserted claims against all of the defendants for unjust enrichment, tortious interference with business relations, violation of chapter 19.108 RCW (the Uniform Trade Secrets Act), conversion, and breach of the fiduciary duty of loyalty.

Berkshire responded by moving to compel arbitration and dismiss the lawsuit. It relied on the fact that all parties to the lawsuit were members of the CBA, a member owned cooperative that provides a commercial real estate multiple listing service and other products to its members. CBA members are required to agree to abide by its bylaws and rules, which require arbitration of some member disputes. The relevant bylaw provision states:

4

> It is the duty of the members of CBA (and each so agrees) **to submit all controversies involving commissions between or among them to binding arbitration by CBA** pursuant to its then current arbitration rules and policies, rather than to bring a suit to law. **The foregoing includes controversies which arose prior to one of the parties becoming a member.** The term "commissions" as used above means commissions or fees arising from the real estate brokerage services as the same is now or in the future defined in RCW 18.85; together with interest and out-of-pocket costs or expenses related thereto and included commissions or fees actually paid, **as well as commissions or fees lost as a result of the acts of another member.**

Clerk's paper's (CP) at 32 (emphasis added).

Cornerstone responded with a cross motion for partial summary judgment against Mr. Seipp on its breach of contract claim. It sought $63,000 in damages for the three percent commission it would have received on the Apartments' gross sale price of $2,100,000. Resisting the motion to compel arbitration, Cornerstone argued that the parties never intended to arbitrate what it characterized as an employment dispute, particularly one that arose before Mr. Seipp, Mr. Lewis, and Berkshire became members of the CBA on April 24, 2015.

The trial court refused to compel arbitration, stating that its decision was based on "two things: one being the independent contractor agreement and the second being that this isn't a simple dispute over commission. The dispute goes well beyond commission." Report of Proceedings (RP) at 21. The trial court also denied Cornerstone's motion for partial summary judgment.

The defendants appeal denial of their motions to compel arbitration and to dismiss.

5

ANALYSIS

Under the Uniform Arbitration Act, chapter 7.04A RCW, courts address two issues in deciding whether claims are subject to an agreement to arbitrate: "first, whether the arbitration agreement is valid, and if so, whether the agreement encompasses the claims asserted." *Wiese v. Cach, LLC*, 189 Wn. App. 466, 474, 358 P.3d 1213 (2015) (citing *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 627-28, 105 S. Ct. 3346, 87 L. Ed. 2d 444 (1985)); *see also* RCW 7.04A.060(2) ("The court shall decide whether an agreement to arbitrate exists or a controversy is subject to an agreement to arbitrate."). Cornerstone does not dispute that the CBA bylaws create a valid arbitration agreement among CBA members, nor could it—as Division One of this court observed last year, "Forty-six years ago, this court set forth the principle that voluntary membership in a professional organization gives rise to a corresponding obligation to comply with that organization's bylaws"—and specifically a bylaw requiring arbitration of member disputes. *Marcus & Millichap Real Estate Inv. Servs. of Seattle, Inc. v. Yates, Wood & MacDonald, Inc.*, 192 Wn. App. 465, 469, 369 P.3d 503, *review denied, Marcus & Millichap Real Estate Inv. v. Yates, Wood & MacDonald*, 185 Wn.2d 1041 (2016) (citing *Keith Adams & Assoc. v. Edwards*, 3 Wn. App. 623, 477 P.2d 36 (1970).

Instead, Cornerstone contends that the CBA arbitration provision cannot apply to the claims asserted in its complaint for several reasons: *first*, the CBA bylaws are not

6

incorporated into Cornerstone's and Mr. Seipp's independent contractor agreement, and cannot modify it; *second*, the defendants joined the CBA after the wrongful conduct occurred; *third*, Mr. Seipp's independent contractor agreement, which does not provide for arbitration, binds Berkshire Hathaway and the Lewises; and *fourth*, its claims do not fall within what it contends is the "very narrow" scope of arbitration required by the CBA bylaws. CP at 202.

We review a trial court's order granting or denying a motion to compel de novo. *Satomi Owners Ass'n v. Satomi, LLC*, 167 Wn.2d 781, 797, 225 P.3d 213 (2009). We first address the scope of the CBA arbitration provision and then address Cornerstone's remaining arguments in turn.

### I. Cornerstone's principal claims fall within the scope of the CBA arbitration agreement, which is broad

Division One of this court had occasion to apply this same CBA arbitration provision in *Marcus*, and observed that "[t]he language of the CBA arbitration provision is broad." 192 Wn. App. at 481. We agree. Noteworthy for present purposes is the provision's language that "commissions," for purposes of its application to "all controversies involving commissions," is defined to include "commissions or fees lost as a result of the acts of another member." CP at 32. Plainly, this language covers claims for commissions that are lost as a result of torts or breaches of contractual or fiduciary duties.

7

Cornerstone asserts that the CBA arbitration provision does not apply because the property was not listed with the CBA and there were no ties to the CBA. But as *Marcus* points out, and we agree, that does not matter; "the plain language of the arbitration agreement is not so limited." 192 Wn. App. at 481. Cornerstone further asserts that the provision does not apply because it suspects the defendants' wrongdoing to involve more than one transaction, and the CBA arbitration provision "is clearly limited to a dispute over one particular transaction" and to having "a panel of three brokers look over the facts of a transaction and determine which broker is entitled to a commission and how much." Br. of Resp't at 39-40. Again, the language of the arbitration agreement is not so limited.

To determine the intent of contracting parties, we begin with the objective manifestations of their agreement, imputing an intention corresponding to the reasonable meaning of words used. *Hearst Commc'ns, Inc. v. Seattle Times Co.*, 154 Wn.2d 493, 503, 115 P.3d 262 (2005). Cornerstone's opinion about what the provision was intended to cover lacks support in its language, which is our touchstone. The most reasonable inference from the breadth of the CBA arbitration provision is that the drafters believed that peer arbitrators, being familiar with real estate industry practice and norms, will be able to resolve disputes more efficiently and fairly than courts. That inference can be drawn whether a dispute involves one lost commission or more than one.

8

*Todd v. Venwest Yachts, Inc.*, 127 Wn. App. 393, 111 P.3d 282 (2005), on which Cornerstone places substantial reliance, is distinguishable. That case involved an arbitration provision in the bylaws of the Northwest Yacht Broker's Association (NYBA) that was unlimited, applying "'[w]hen a dispute arises between members, between members and nonmember [sic], or between members and the public.'" *Id.* at 396 (first alteration in original). If applied literally, it would have required the plaintiff, Mr. Todd, to use Yacht Broker's Association arbitration to resolve disputes over *e.g.*, a motor vehicle accident, a boundary dispute with a neighbor, or a medical malpractice claim against a health care provider. Because the court could not determine a reasonable intended scope of the provision from its language, it necessarily looked to surrounding circumstances for the bylaws' drafter's intent, and concluded that the arbitration provision was not intended to cover members' employment relationships. *Venwest* reflects an approach to be followed only when intent cannot be determined from an arbitration provision's language. When (as here) intent *can* be determined from language, it is irrelevant to the scope of an arbitration provision that membership in a professional organization is voluntary, *Marcus*, 192 Wn. App. at 475 (citing *Keith Adams*, 3 Wn. App. at 624); or that the arbitration obligation is not reflected in a written agreement between the parties; *id.* at 476 (citing *Keith Adams*, 3 Wn. App. at 625); or that the arbitration involves matters that are complex. *Shearson/Am. Express, Inc. v. McMahon*, 482 U.S. 220, 239, 107 S. Ct. 2332, 96 L. Ed. 2d 185 (1987) (observing that

9

neither antitrust nor RICO claims had been deemed too complex to be resolved in arbitration).

Cornerstone also argues that it seeks relief other than lost commissions, pointing to its prayer for injunctive relief to protect its trade secrets. Br. of Resp't at 3-4. To the extent Cornerstone seeks relief having no relation to lost commissions, we agree that arbitration need not be compelled. We address that in the final section of this opinion. But the lost commission claim is clearly the principal part of the parties' dispute at this point. This is clear from the section of Cornerstone's appellate brief devoted to the "factual background of the dispute," *see id.*, at 8-19 (capitalization omitted), and from Cornerstone's earlier motion for partial summary judgment, which relied solely on the Apartments transaction. *See* CP at 369 ("There is . . . no dispute that Cornerstone lost the commission sale . . . as a proximate result of Defendant's breach . . . . Cornerstone therefore asks for . . . a . . . finding that Mr. Seipp is liable for the principal amount of $63,000.").

Cornerstone's legal claims for lost commissions on the Apartments transaction or any other transaction, regardless of the legal theory, are subject to the CBA arbitration provision.

## II. *The duty to arbitrate does not conflict with Mr. Seipp's independent contractor agreement*

Cornerstone argues that even if the dispute below would otherwise fall within the scope of its obligation to arbitrate under the CBA bylaws, Mr. Seipp's act of joining the CBA in 2015 cannot modify the independent contractor agreement that he signed with Cornerstone in 2010. It relies on three provisions of the independent contractor agreement that it contends would be impermissibly modified if its duty to arbitrate under the CBA bylaws is enforced. They are paragraph 7.3, which states:

> In the event that it is necessary to enforce this Agreement through legal action brought by either party, venue shall be in Spokane County, Washington[,]

paragraph 8.2, which states:

> In the event that a court of competent jurisdiction finds any portion of this Agreement to be illegal or unenforceable, the remainder of this Agreement shall survive and bind Broker and Associate[,]

and paragraph 8.1, which states:

> This Agreement, when signed by Broker and Associate, in conjunction with the attached Exhibits, represents the entire agreement between Broker and Associate. There are no other agreements, verbal or otherwise. This Agreement supersedes any prior agreement between Broker and Associate. This Agreement may only be altered or amended by a written agreement signed by Broker and Associate.

CP at 80.

Paragraph 7.3 does not require that disputes be resolved in a court of law. "Venue," to which it refers, is a concept common to arbitration and litigation. *See, e.g.,*

11

*Gandee v. LDL Freedom Enters., Inc.*, 176 Wn.2d 598, 604, 293 P.3d 1197 (2013); *Saleemi v. Doctor's Assocs., Inc.*, 166 Wn. App. 81, 86, 269 P.3d 350 (2012), *aff'd*, 176 Wn.2d 368, 292 P.3d 108 (2013). The defendants did not ask the court to compel arbitration in a venue other than Spokane County. "Legal action" can obviously refer to arbitration.

Paragraph 8.2 addresses what happens *if* a court of competent jurisdiction finds a portion of the agreement to be illegal or unenforceable. It does not require that disputes be resolved in court.

Paragraph 8.1 was accurate in stating that at the time it was signed, it was the parties' only agreement; Mr. Seipp was not a member of the CBA at the time. Mr. Seipp's act of joining the CBA—thereby accepting other CBA members' standing offer to arbitrate in accordance with the bylaws—did not alter or amend his independent contractor agreement, which created no obligation to resolve disputes in court. And even if it had, it is well settled that a contract may be modified or abrogated by the parties in any manner they choose, notwithstanding provisions in the contract prohibiting its modification or abrogation except in a particular manner. *Columbia Park Golf Course, Inc. v. City of Kennewick*, 160 Wn. App. 66, 82, 248 P.3d 1067 (2011).

12

### III. Berkshire and the Lewises are not obliged to resolve the claims against them in court

Cornerstone argues that Berkshire and the Lewises are required to litigate rather than arbitrate for three reasons.

It first contends they must litigate because the dispute arose before Berkshire and the Lewises joined the CBA on April 24, 2015. But the CBA arbitration provision states, plainly, that the duty to submit controversies involving commissions to arbitration "includes controversies which arose prior to one of the parties becoming a member." CP at 32. *Weiss v. Lonnquist*, 153 Wn. App. 502, 224 P.3d 787 (2009), *aff'd*, 173 Wn. App. 344, 293 P.3d 1264 (2013), on which Cornerstone relies, does not hold that arbitration contracts cannot cover preexisting disputes. They plainly can. By statute, "[a]n agreement contained in a record to submit to arbitration any *existing* or subsequent controversy arising between the parties to the agreement is valid, enforceable, and irrevocable except upon a ground that exists at law or in equity for the revocation of contract." RCW 7.04A.060 (emphasis added).

Cornerstone next invokes a body of case law that, on several theories, will find that a nonsignatory to an arbitration agreement is bound by an arbitration agreement signed by its agent. Whether the nonsignatory is bound turns on traditional principles of agency law. Cornerstone cites *E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.*, 269 F.3d 187, 198 (3d Cir. 2001), for example, in which the

13

defendant unsuccessfully argued that the plaintiff, DuPont, was bound to arbitrate a dispute based on the arbitration clause in a joint venture agreement between the defendant and DuPont's Chinese subsidiary. Two facts must appear: (1) an arrangement must exist so that the signatory was acting on behalf of the other under usual agency principles in entering into the arbitration agreement, and (2) the same arrangement must be relevant to the facts giving rise to the cause of action. *Id.*

The cases on which Cornerstone relies extend the operation of an *agreement to arbitrate* beyond signatory parties. Cornerstone argues that Mr. Seipp's *agreement to litigate* can be extended beyond himself, but we have already held that the independent contractor agreement imposes no duty to litigate. And no facts support a finding, under usual agency principles, that Mr. Seipp was acting on behalf of Berkshire and the Lewises when he signed the independent contractor agreement in 2010. For both reasons, the case law relied on by Cornerstone does not apply.

Finally, Cornerstone invokes the doctrine of equitable estoppel, which precludes a party from claiming the benefits of a contract while simultaneously attempting to avoid the burdens that the contract imposes, citing *Townsend v. Quadrant Corp.*, 173 Wn.2d 451, 461, 268 P.3d 917 (2012). In *Townsend*, our Supreme Court held that the children of homeowners were bound by an arbitration clause in their parents' purchase and sale agreement where the children were attempting to enforce the terms of that agreement, including its warranties. Here, Berkshire and the Lewises—*defendants* in this action—

14

are not trying to enforce rights under Mr. Seipp's independent contractor agreement. And, again, the independent contractor agreement creates no duty to litigate that Berkshire or the Lewises need to avoid.

### *IV. We affirm the trial court's denial of the motion to dismiss*

The defendants moved to dismiss Cornerstone's complaint on the basis that its claims were subject to mandatory arbitration. But RCW 7.04A.070(6) provides that "[i]f the court orders arbitration, the court shall on just terms *stay* any judicial proceeding that involves a claim subject to the arbitration. If a claim subject to the arbitration is severable, the court may sever it and limit the stay to that claim." (Emphasis added.) Cornerstone contends that at least some claims are not subject to arbitration. Even if it did not, staying rather than dismissing litigation preserves the court's jurisdiction to confirm an award following arbitration or take other actions authorized by chapter 7.04A RCW. *See* RCW 7.04A.220 (court may confirm unless the award is modified, corrected, or vacated).

The defendants further contend that dismissal was appropriate because Cornerstone's claims are time barred under the CBA's arbitration rules. Whether the claims are time barred is an issue for the arbitrators. *See* RCW 7.04A.060(3) ("An arbitrator shall decide whether a condition precedent to arbitrability has been fulfilled.").

Finally, we address the need on remand to determine what issues, if any, will remain before the court to be litigated. Decisions of the United States Supreme Court

15

provide that trial courts must compel arbitration of "pendent arbitrable claims." The defendants misconstrue the requirement when they turn to a dictionary for a definition of "pendent" and construe "pendent arbitrable claims" as meaning claims that do not fall within the scope of the parties' arbitration agreement but arise out of the same "transaction or occurrence" as the arbitrable claims. Reply Br. at 7-9. "Pendent arbitrable claims" are, instead, claims that *do* fall within the scope of an arbitration agreement but that a court might resist ordering to arbitration because they are closely related to nonarbitrable claims that will remain before the court. "[I]f a dispute presents multiple claims, some arbitrable and some not, the former must be sent to arbitration even if this will lead to piecemeal litigation. . . . A court may not issue a blanket refusal to compel arbitration merely on the grounds that some of the claims could be resolved by the court without arbitration." *KPMG LLP v. Cocchi*, 565 U.S. 18, 19, 132 S. Ct. 23, 181 L. Ed. 2d 323 (2011) (citing *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 217, 105 S. Ct. 1238, 84 L. Ed. 2d 158 (1985)).

Accordingly, although we direct the trial court to compel arbitration of all of Cornerstone's claims for relief that seek to determine or recover commissions, or commissions or fees lost as a result of the acts of the defendants, it is conceivable that some claims for relief will not be arbitrable—for example, a request for an injunction against use of trade secrets or for the court-ordered return of Cornerstone's property

16

No. 34692-7-III
*SVN Cornerstone LLC v. N. 807 Inc.*

would not be.[3]  In making the determination, the court must bear in mind that Washington courts apply a "'strong presumption in favor of arbitrability,'" and "'[d]oubts should be resolved in favor of coverage.'" *Peninsula Sch. Dist. No. 401 v. Pub. Sch. Emps. of Peninsula*, 130 Wn.2d 401, 414, 924 P.2d 13 (1996) (quoting *Council of County & City Emps. v. Spokane County*, 32 Wn. App. 422, 424-25, 647 P.2d 1058 (1982).

We reverse denial of the motion to compel arbitration and remand for proceedings consistent with this opinion.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

Siddoway, J.

WE CONCUR:

Fearing, C.J.

Pennell, J.

---

[3] Claims for commissions or fees derived from the defendants' use of such property, including trade secret information, would of course be arbitrable.