THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | | |
|---|---|---|
| COLORADO TIRE CORP., a Washington Corporation, and ABRAHAM HENGYUCIUS, an individual, and THE MARITAL COMMUNITY OF ABRAHAM HENGYUCIUS AND JANE DOE, | ) ) ) ) ) | No. 82633-6-I |
| | ) | DIVISION ONE |
| | ) | UNPUBLISHED OPINION |
| Appellants, | ) ) | |
| v. | ) ) | |
| MORAGLIS S.A., a Greek Corporation, | ) ) | |
| Respondent. | ) ) ) | |

ANDRUS, C.J. — Colorado Tire Corporation and its president, Abraham Hengyucius (collectively referred to as CTC), appeal a monetary judgment of $401,210, entered against both after they failed to respond to a summary judgment motion filed by Moraglis, S.A. CTC contends the trial court abused its discretion in denying its request for a CR 56(f) continuance, denying its CR 59 motion for reconsideration, and refusing to consider evidence submitted with that motion. CTC also argues there is insufficient evidence to support the judgment against the corporation and its president personally.

Although the court did not abuse its discretion in refusing to continue the summary judgment hearing or in rejecting CTC's untimely evidence on reconsideration, we nevertheless reverse in part the judgment against CTC and reverse, in its entirety, the

judgment against Hengyucius as unsupported by the evidence Moraglis submitted. We remand these issues for further litigation.

FACTS

Moraglis, a Greek corporation based in Patras, Greece, sought to supply tires to the North Atlantic Treaty Organization (NATO) and the Greek Hellenic Army. It contacted CTC, a Washington corporation, through CTC's president, Abraham Hengyucius, to purchase tires. After several months of exchanging e-mails regarding the availability of certain types of tires, on December 20, 2019, Moraglis placed an order with CTC for 2,200 tires. When it did so, Moraglis asked CTC to confirm that the tires conformed to a list of "technical details," including a "Speed Index" of "R" and a "Load Capacity Index" of "120/116."[1] It also sought assurance that CTC's tires were suitable for use on cross country roads and highways when mounted on specified vehicles. On December 23, 2019, CTC confirmed that its tires met these specifications.

Moraglis Konstantinos, the chief executive officer of the corporation, testified that Hengyucius represented that CTC's tires were suitable for use on the front and back axles of small trucks, that the tires would be manufactured and shipped from the United States, and that the tires would come with an "ECE" certificate indicating that they could be used

---

[1] A load capacity index indicates the load a tire can carry in single or dual operation corresponding to the associated speed category. A load index of 120 corresponds to a maximum mass to be carried of 1,400 kg. A speed rating, typically indicated by a symbol, indicates the speeds at which the tire can carry the load indicated by the associated load capacity index. A speed rating of "R" corresponds to tires rated to reach speeds of 170 km/h. *See* United Nations (U.N.) Regulation No. 54, *Uniform provisions concerning the approval of pneumatic tyres for commercial vehicles and their trailers*, E/ECE/324/Rev.1/Add.53/Rev.3-E/ECE/Trans/505/Rev.1/Add.53/Rev.3 (March 26, 2013), available at https://unece.org/fileadmin/DAM/trans/main/wp29/wp29regs/2013/R054r3e.pdf (last visited on June 29, 2022) (hereafter referred to as U.N. Regulation No. 54).

2

in Greece.[2] Konstantinos's testimony was corroborated by an e-mail from Hengyucius on July 2019 in which he informed a Moraglis representative that although "[t]he ECE certificate is not immediately available to provide," if Moraglis's end user insisted on the certificate, "it may be provided when we start shipping the tires. . . ."

On December 24, 2019, CTC e-mailed Moraglis a "sales confirmation" document with a set of "Standard Terms and Conditions," in which it confirmed that CTC agreed to sell Moraglis 2,200 steel radial tires, size "235/85R16" with "E-marks designed and produced for using in Greece" at a price of $86.75 per tire.[3] The confirmation also stated that the tires would be "[r]eady for the 1st shipment in 30-90 days after CTC's receipt of prepayment." CTC asked Moraglis to sign and return the document and make a 30 percent prepayment within three days. Moraglis executed the agreement and wired a total of $190,850 to CTC to purchase the tires.

CTC shipped tires from Qingdao, China, in two shipments, on April 16 and April 28, 2020. It appears the tires were available at the Port of Piraeus, Greece, in May 2020. Moraglis forwarded the tires to its end user, NATO, who rejected them as not conforming. NATO indicated the delivered tires had a speed index of "L" instead of "R," and a load capacity index of "132/127," rather than "120/116." It also indicated that the tires were

---

[2] The reference to "ECE" appears to be a reference to the United Nations Economic Commission for Europe, an organization of European states that sets trade standards for its members. *See UNECE, Sustainable Development Goals*, at https://unece.org/introduction-24. The ECE member states have executed several conventions, including those relating to uniform standards for tires. *See Agreement Concerning the Adoption of Harmonized Technical United Nations Regulations for Wheeled Vehicles, Equipment and Parts which Can be Fitted and/or be Used on Wheeled Vehicles and the Conditions for Reciprocal Recognition of Approvals Granted on the basis of these United Nations Regulations* (March 20, 1958), United Nations, Treaty Series, vol. 335, p. 211.

[3] Under U.N. regulations, every tire certified as meeting uniform standards must be stamped with an international approval mark. *See* U.N. Regulation No. 54 at § 5.4.1 and 5.4.2.

stamped "ST" for "service truck," and "For Trailer Service Only," instead of "LT for "light truck," as it had ordered.

Moraglis notified CTC of the non-conformity and asked it to "make immediate arrangements to take return delivery of the tires" and replace them. In the e-mail, Moraglis stated the replacement tires "must be manufactured in the US as we agreed." CTC did not respond to these demands.

Moraglis filed a complaint against CTC and Hengyucius in King County Superior Court on October 29, 2020. Moraglis alleged breach of contract, breach of express and implied warranties, conversion, and negligent misrepresentation. Moraglis sought monetary damages of $350,850, plus interest and attorneys' fees, against both the corporate entity and its president.

On November 23, 2020, Moraglis notified CTC, through counsel, that it could not find anyone to purchase the non-conforming tires and that "there is not a market for [the] tires in Europe." Moraglis stated that it intended to pick up and store the tires and would seek costs associated with the transportation and storage from CTC. Moraglis later informed CTC that the tires might need to be destroyed.

At some point that fall, Hengyucius stopped responding to his own attorney. In mid-January 2021, CTC's counsel withdrew, effective February 1, 2021.

On February 17, 2021, Moraglis filed a four-page motion for summary judgment on all claims, supported by Konstantinos's declaration. Konstantinos confirmed that NATO had rejected CTC's tires because they did not conform to its technical specifications. He further testified that CTC failed to respond to Moraglis's request to reimburse Moraglis for port and custom fees, to accept the return of the tires, and to

4

replace them with conforming tires. He identified the company's damages as the purchase price of $190,850, additional damages of $157,296.74 associated with "demurrages[4] charges, port storage charges, and anti-dumping charges," (referred to hereafter as port charges) and another $5,612.59 in costs incurred to transport and recycle the non-conforming tires.

On March 18, 2021, one day before the summary judgment hearing, Hengyucius contacted his former attorney, retained him to respond to the motion, and claimed that he had been ill and unable to deal with the lawsuit. Counsel filed a CR 56(f) request to continue the hearing. The next day, the trial court denied CTC's motion to continue and granted Moraglis's summary judgment motion.

On March 26, 2021, CTC objected to the summary judgment order, claiming that the amount of damages Moraglis requested was unsupported by the record and challenging the basis for Hengyucius's personal liability on any monetary award. The trial court overruled the objections and signed a judgment against CTC and Hengyucius, awarding a total of $401,210 against them.

On April 19, 2021, CTC filed a motion for reconsideration. For the first time, Hengyucius submitted a declaration with exhibits to rebut Moraglis's claims as to liability and damages. The trial court denied the motion for reconsideration. CTC appeals.

---

[4] Demurrage is "liquidated damages owed by a charterer to a shipowner for the charterer's failure to load or unload cargo by the agreed time." BLACK'S LAW DICTIONARY 545-46 (11th ed. 2019).

ANALYSIS

CTC's CR 56(f) Request

CTC first argues that the trial court should have granted its request for continuance of the summary judgment hearing to permit it to respond substantively to Moraglis's motion. CTC, however, has not demonstrated any abuse of discretion in denying its requested continuance.

"Whether a motion for continuance should be granted or denied is a matter of discretion with the trial court, reviewable on appeal for manifest abuse of discretion." *Trummel v. Mitchell*, 156 Wn.2d 653, 670, 131 P.3d 305 (2006). "Abuse of discretion is not shown unless the discretion has been exercised upon a ground, or to an extent, clearly untenable or manifestly unreasonable." *Friedlander v. Friedlander*, 80 Wn.2d 293, 298, 494 P.2d 208 (1972). CR 56 (f) states:

> Should it appear from the affidavits of a party opposing the motion that for reasons stated, the party cannot present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

CR 56(f) permits a trial court to continue a summary judgment motion when the party seeking a continuance offers a good reason for the delay. *Durand v. HIMC Corp.*, 151 Wn. App. 818, 828, 214 P.3d 189 (2009). "The trial court may deny a motion for a continuance when (1) the requesting party does not have a good reason for the delay in obtaining the evidence, (2) the requesting party does not indicate what evidence would be established by further discovery, or (3) the new evidence would not raise a genuine issue of fact." *Bldg. Indus. Ass'n of Wash. v. McCarthy*, 152 Wn. App. 720, 742-43, 218 P.3d 196 (2009) (quoting *Butler v. Joy*, 116 Wn. App. 291, 299, 65 P.3d 671 (2003)).

6

Denial is proper if based on any one of these factors.  *Pelton v. Tri-State Mem'l Hosp., Inc.*, 66 Wn. App. 350, 356, 831 P.2d 1147 (1992).

In this case, neither CTC nor Hengyucius explained why they failed to respond to their attorney or to the dispositive motion.  CTC's attorney submitted a declaration recounting Hengyucius's non-responsiveness, his client's last-minute resurfacing, and the hearsay claim that Hengyucius had been ill "for the last few months and unable to attend to this matter as a result."  Hengyucius, however, did not explain what his illness was, what treatment, if any, he had obtained, or why he could not respond to his own attorney's calls or e-mails.

The trial court denied the continuance request because the motion was untimely, improperly noted, and "just generally a request for more time."  The court indicated that the showing was inadequate "to comply with the rule."  The trial court's ruling was based on tenable reasons.  A failure to articulate a good reason for the delay in opposing a summary judgment motion justifies the denial of a continuance request.  *Barkley v. GreenPoint Mortg. Funding, Inc.*, 190 Wn. App. 58, 71, 358 P.3d 1204 (2015).

CTC argues that Hengyucius was a material witness and was unavailable to respond to the motion.  It contends that under *Cofer v. Pierce County*, 8 Wn. App. 258, 262-63, 505 P.2d 476 (1973), the failure to grant a continuance "where a material witness was unavailable to sign an affidavit for summary judgment due to serious illness" is an abuse of discretion.  But that case is distinguishable.  The party seeking the continuance established that the crucial witness—not a party to the lawsuit, but a fact witness—was actually in the hospital and physically unable to sign an affidavit.  There was no evidence before the trial court here that Hengyucius was so ill that he was incapable of signing a

7

declaration in a timely manner. CTC based its motion solely on counsel's uncorroborated statement that Hengyucius had been ill without any further information as to the severity of the illness or any indication it led to a hospitalization.

CTC also cites to *Coggle v. Snow*, 56 Wn. App. 499, 508, 784 P.2d 554 (1990), in which this court concluded the trial court abused its discretion in denying a CR 56(f) motion. But that case, too, is distinguishable. It involved a client who replaced an attorney who had needlessly dragged out discovery for two years. The court concluded that "[t]he client, Coggle, after obtaining new counsel, should not be penalized for the apparently dilatory conduct of his first attorney." *Id.* Here, it was Hengyucius, not his attorney, who was dilatory in responding to discovery and to the summary judgment motion.

Finally, CTC relies on *Butler v. Joy*, 116 Wn. App. 291, 299, 65 P.3d 671 (2003), to argue that failing to grant a continuance when a party hires new counsel the day before a summary judgment hearing is an abuse of discretion. But *Butler* involved an initially pro se litigant who had hired counsel, lost counsel, and then hired a different attorney a day before the hearing; the new attorney was genuinely unfamiliar with the case and could not say what new evidence could be expected to be discovered if the continuance were granted. *Id.* The factual circumstances here are, yet again, distinguishable. CTC's attorney withdrew from the case two months before the summary judgment hearing and was *rehired* the day before the hearing—a situation created by his client's ongoing failure to act. The trial court stated at the hearing, "We understand that we have varied levels of client cooperation . . . But even if we assume [the illness] to be true, that doesn't excuse what has occurred in this case." We see no abuse of discretion in reaching this

8

conclusion. Because the trial court gave tenable reasons for its decision, it did not abuse its discretion in denying CTC's CR 56(f) motion.

CTC's CR 59 Motion

CTC next argues the trial court should have granted its motion for reconsideration and considered the evidence it presented with that motion. Again, we conclude the trial court did not abuse its discretion in refusing to grant the CR 59 motion.

We review the denial of a motion for reconsideration and the refusal to consider new evidence for abuse of discretion; we will not reverse the decision absent a showing of manifest abuse of discretion. *Phillips v. Greco*, 7 Wn. App. 2d 1, 9, 433 P.3d 509 (2018); *Martini v. Post*, 178 Wn. App. 153, 162, 313 P.3d 473 (2013).

A party seeking reconsideration must identify a basis for this motion under CR 59. CTC did not identify any particular provision of CR 59 and, relying on the previous declaration of counsel and a new declaration of Hengyucius, argued that the court should consider Hengyucius's untimely declaration because he had been too ill to respond to the motion in a timely manner. Hengyucius testified:

> In early December 2020, I became very sick with an unknown illness. I spent many days in bed and was too afraid to visit a doctor because I believed I would contract COVID-19. For months, I was physically and mentally unable to do basic tasks and I did not check emails, answer phone calls, or attend to anything other than basic self-care. As a result, I was not aware of the Motion for Summary Judgment until I finally checked my mail box on March 18, 2021. On that date, I immediately contacted my attorney, Mr. Daudt and explained myself.

With this testimony, CTC appears to contend that Hengyucius's inability to provide a declaration in time to refute Moraglis's motion was excusable. CR 6(b)(2) gives the trial court the discretion to allow a party to file an affidavit or declaration after the deadline for doing so has passed if the failure to act was the result of "excusable neglect." But courts

9

determine excusable neglect on a case-by-case basis, and the trial court may make credibility determinations and weigh facts in order to resolve it. *Rosander v. Nightrunners Transp., Ltd.*, 147 Wn. App. 392, 406, 196 P.3d 711 (2008) (trial court did not abuse discretion in finding reasons given for failure to attend default hearing lacked credibility).

The trial court was not required to accept Hengyucius's excuse as a credible explanation for not staying in contact with his attorney, not properly noting a motion for the requested continuance, and not responding in a timely way to the summary judgment motion. The trial court was within its discretion to find that Hengyucius's explanation for not checking his mail until, conveniently, the day before the hearing, was not excusable neglect under CR 6(b) or good cause for a continuance under CR 56(f).

CTC also argues the trial court abused its discretion in not considering the new evidence it submitted with the motion for reconsideration. CR 59(a)(4) provides that a reconsideration motion "may be granted" if the party produces "[n]ewly discovered evidence, material for the party making the application, which the party could not with reasonable diligence have discovered and produced at trial." This rule requires the moving party to establish that the evidence (1) will probably change the result, (2) was discovered since the court ruled in favor of the opposing party, (3) could not have been discovered earlier in the exercise of due diligence, (4) is material, and (5) is not merely cumulative or impeaching. *Go2Net, Inc. v. C I Host, Inc.*, 115 Wn. App. 73, 88, 60 P.3d 1245 (2003).

The trial court did not abuse its discretion in determining that the declaration was inadequate to meet this test. Hengyucius did not identify any evidence of which he was unaware before he became ill. Moraglis filed its lawsuit on October 29, 2020. Hengyucius

did not fall ill until early December. He did not explain why, in the interim before he fell ill, he was unable to provide his attorney with the contract, emails with Moraglis, and all of the shipping records. Nor does he explain why he was unable to place a single phone call to his attorney at the start of his illness to notify counsel of his lack of availability. The trial court here was within its discretion to deem Hengyucius's explanation not credible and to refuse to consider evidence CTC submitted on reconsideration.

Summary Judgment Against CTC

CTC next argues that, even if this court disregards Hengyucius's declaration, summary judgment was still improper because issues of material fact remain, both as to liability and damages. We agree that Moraglis's evidence leaves genuine issues of material fact as to some, but not all, of its contract claims against CTC.

To prevail on a claim of breach of contract, a plaintiff must prove (1) a duty imposed by the contract that (2) was breached and (3) damages proximately caused by the breach. *Nw. Indep. Forest Mfrs. v. Dep't of Labor & Indus.*, 78 Wn. App. 707, 712, 899 P.2d 6 (1995). The parties agree they had a contract for the sale of tires but disagree about the applicable law governing our interpretation of the contract terms. They also dispute whether the evidence establishes breach and proximate cause.

CTC first contends the Convention on the International Sale of Goods (CISG)[5] applies to this sales contract and preempts Washington's Uniform Commercial Code (UCC) provisions on the sale of goods, ch. 62A.2 RCW. In the United States, the CISG is a self-executing treaty with the preemptive force of federal law. R. Speidel, *The Revision of UCC Article 2, Sales in Light of the United Nations Convention on Contracts*

---

[5] United Nations Convention on Contracts for the International Sale of Goods, Final Act April 11, 1990, U.N. Doc. A/Conf. 97/18, *reprinted in* S. Treaty Doc. No. 98-9, 98th Cong., 1st Sess. and 19 I.L.M. 668 (1980).

*for the International Sale of Goods*, 16 Nw. J. Int'l Law & Bus. 165, 166 (1995); *see also Chateau des Charmes Wines Ltd. v. Sabate USA, Inc.*, 328 F.3d 528, 530 (9th Cir. 2003) (international sales contracts ordinarily governed by CISG when parties to contract do business in states that are parties to the convention).

But CTC did not invoke the CISG or argue federal preemption before the trial court, even on reconsideration. Federal preemption may not be raised for the first time on appeal. *Wingert v. Yellow Freight Sys.*, 146 Wn.2d 841, 853-54, 50 P.3d 256 (2002). A choice-of-law preemption defense is deemed waived if not raised in the trial court. *Brannan v. United Student Aid Funds, Inc.*, 94 F.3d 1260, 1266 (9th Cir. 1996); *Rapid Settlements, Ltd.'s Application for Approval of Transfer of Structured Settlement Payment Rights*, 166 Wn. App. 683, 695, 271 P.3d 925 (2012). When CTC answered Moraglis's complaint, it raised defenses under the UCC; it did not raise the CISG as the applicable law. We conclude CTC waived its federal preemption defense.

Additionally, CTC has not demonstrated that the CISG conflicts with Washington law. When the parties dispute choice of law, there must be an actual conflict between the laws of Washington and the laws of the other state before Washington courts will engage in a conflict of law analysis. *Erwin v. Cotter Health Centers*, 161 Wn.2d 676, 691, 167 P.3d 1112 (2007). We therefore apply Washington law, as the trial court did.

As to whether the evidence Moraglis provided supports a finding of breach and proximate case, we review all summary judgment rulings de novo. *Int'l Marine Underwriters v. ABCD Marine, LLC,* 179 Wn.2d 274, 281, 313 P.3d 395 (2013). The moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there

is no genuine issue as to any material fact." CR 56(c). We review the facts and reasonable inferences in the light most favorable to the non-moving party. *Larson v. Snohomish County*, 20 Wn. App. 2d 243, 274, 499 P.3d 957 (2021).

Moraglis alleged CTC breached the sales contract by failing to supply tires that met the agreed-upon technical specifications, by failing to deliver the tires within 90 days of Moraglis's first payment, by supplying tires manufactured in China rather than the United States, and by delivering tires without the proper certifications required in Europe.

We conclude that the undisputed evidence supports Moraglis's claims of breach as to the tires' noncompliance with the agreed-upon technical specifications. There are, however, genuine issues of fact as to whether the parties agreed on a 90-day delivery term or a requirement that the tires be manufactured in or shipped from the United States.

A. <u>Failure to Meet Technical Specifications</u>

Moraglis presented testimony and photographic evidence that CTC failed to supply tires that met its technical specifications, including a specified speed and load index. CTC contends their agreement did not incorporate any technical specifications—other than tire size and type. Moraglis, on the other hand, directs our attention to the technical specification sheet CTC agreed to meet and the lack of a contract integration clause. The undisputed evidence supports Moraglis here.

Under the UCC's parol evidence rule, RCW 62A.2-202(b), the terms of a contract for the sale of goods which are set out in writing and "intended by the parties as a final expression of the parties' agreement . . . may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented: . . . (b) By evidence of consistent additional terms unless the court finds

13

the writing to have been intended also as a complete and exclusive statement of the terms of the agreement." Whether the parties intend a written document to be a final expression of the terms of the agreement is generally a question of fact. *M.A. Mortenson Co.*, *Inc. v. Timberline Software Corp.*, 140 Wn.2d 568, 579, 998 P.2d 305 (2000). In determining whether an agreement is integrated, the court may consider evidence of negotiations and circumstances surrounding the formation of the contract. *Id.* If reasonable minds can reach but one conclusion on this issue of fact, it may be determined on summary judgment. *Id.*

First, CTC's "Standard Terms and Conditions" contained no integration clause. The absence of such a clause supports the conclusion that the written terms were not the complete agreement between the parties. *M.A. Mortenson*, 140 Wn.2d at 580. Second, when Moraglis placed its order with CTC, it explicitly asked CTC to confirm that the tires would meet a specific set of technical specifications, including a speed and load rating suitable for use on the front and back axles of small trucks to be driven on European highways. CTC confirmed in writing that its tires would meet these specifications. The e-mails support only one reasonable conclusion—Moraglis would not have ordered tires from CTC without the assurance that they would meet these technical specifications. Moraglis established that written "Standard Terms and Conditions" was not the full agreement and the technical specifications formed a part of the contract.

Because the technical specifications became a part of the parties' agreement, the undisputed evidence establishes that Moraglis received nonconforming tires. The photographs Moraglis submitted show tires with an identified speed rating of "L," rather than "R." Moraglis also presented undisputed evidence that the CTC tires had a load

capacity of "132/127," rather than the load rating Moraglis specified. Finally, CTC supplied tires literally stamped with the words "for trailer service only" despite Moraglis informing CTC that the tires needed to be suitable for use on the front and back axles of small trucks. This undisputed evidence supports only one reasonable finding—that CTC breached the sales contract by delivering non-conforming goods to Moraglis.[6]

### B. Origin of Tires

Moraglis argued below that CTC agreed to supply only tires manufactured in and shipped from the United States. On the record before us, there are questions of fact whether the parties agreed to such manufacturing and shipment terms.

Konstantinos testified that "[i]n the email correspondence, attached as Exhibit A, CTC through Mr. Hengyucius assured us that the tires we wanted to purchase for our client in Europe would be manufactured and shipped from the United States." Exhibit A to his declaration includes a series of e-mails between Hengyucius and a Moraglis representative and a proposal entitled "Confidential Pricing and Commercial Terms." There is no reference in the e-mails or the proposal to an agreed origin of the tires. In the "Delivery Terms," CTC did say "[t]ransit [t]ime from USA to Greece or Sweden: 4 – 6 weeks after the date of departure." While this language could suggest that the parties agreed the tires would be shipped from the United States, it says nothing about the place of manufacture. From this record, we cannot conclude as a matter of law that the parties

---

[6] Questions of fact, however, remain regarding whether CTC delivered the promised certifications needed for the tires to be used in Greece. Konstantinos testified that CTC assured him that "a[n] ECE certificate would accompany the shipment of tires." The "Sales Confirmation" explicitly stated that CTC would deliver tires "designed and produced for using in Greece." Konstantinos testified that "CTC never sent Plaintiff the required and agreed to E-54R certificates for the tires so that the tires could be used in Europe." But Moraglis submitted an e-mail from CTC indicating that CTC had in fact mailed Moraglis the required certificates.

agreed that CTC would supply only tires manufactured in or shipped from the United States.

### C. Damages Awarded

CTC next argues that Moraglis failed to present sufficient evidence to substantiate the damages that the trial court awarded for the breach of contract. We agree in part.

Moraglis sought three elements of damage: (1) a refund of the $190,850 purchase price, (2) $157,296.74 in port charges, and (3) $5,612.59 in costs it incurred to transport and recycle the tires when it could not locate another buyer. It also sought pre- and post-judgment interest and attorney fees. The final judgment awarded all the requested damages, including an award of $42,451.18 in prejudgment interest and $5,000 in attorney fees.

On appeal, CTC challenges only the port charges, the recycling costs, and the computation of prejudgment interest.[7, 8] We address each in turn.

---

[7] CTC asserted within its factual background section that attorney fees were improper but did not include any argument for why the fee award was erroneous. "If an appellant's brief does not include argument or authority to support its assignment of error, the assignment of error is waived." *Riley v. Iron Gate Self Storage*, 198 Wn. App. 692, 713, 395 P.3d 1059 (2017). We therefore do not review the trial court's award of attorney fees.

[8] CTC also fails to challenge the award of the $190,850 purchase price. Under RCW 62A.2-711(1), Moraglis has a statutory right to a refund:

> Where . . . the buyer rightfully rejects or justifiably revokes acceptance, then with respect to any goods involved, and with respect to the whole if the breach goes to the whole contract (RCW 62A.2-612), the buyer may cancel and whether or not he or she has done so may in addition to recovering so much of the price as has been paid. . . .

(Emphasis added.) We therefore affirm the $190,850 judgment against CTC.

16

1.  Port Charges

CTC argues that Moraglis failed to prove that the port charges were the result of any breach. We agree. Moraglis conceded at oral argument that the port charges are causally linked only to its claim that CTC breached the agreement by supplying tires manufactured in China.[9] As there are questions of fact whether the parties actually agreed to this term, there are also questions of fact whether this element of claimed damage is causally connected to a breach.

Moraglis has the burden to prove that its damages are the result of a breach. *Columbia Park Golf Course, Inc. v. City of Kennewick*, 160 Wn. App. 66, 83, 248 P.3d 1067 (2011). "Damages, even though not general, which follow a breach because of special circumstances, are actionable so long as they are the direct and proximate consequence of the breach." *Larsen v. Walton Plywood Co.*, 65 Wn.2d 1, 7, 390 P.2d 677 (1964). If a trier of fact concludes the parties did not agree that CTC would supply only tires manufactured in or shipped from the United States, then Moraglis may not be able to prove a causal link between the port charges and any breach by CTC. Because there are questions of fact to be determined at trial, we reverse the award of $157,296.74 in port charges.[10]

2.  Recycling Costs

CTC argues that the trial court erred in awarding the expenses Moraglis incurred to transport the tires to a recycler to dispose of them. We disagree. This type of damage

---

[9]  June 9, 2022 Court of Appeals, Division I, Argument at 9:32-9:57, available at https://www.tvw.org/watch/?clientID=9375922947&eventID=2022061063.

[10] CTC contends there are also genuine issues of material fact as to whether Moraglis mitigated these damages. Because we reverse this part of the judgment, CTC will have the opportunity to raise this affirmative defense on remand.

17

is recoverable under the UCC, and Konstantinos's declaration provides the necessary evidentiary support for the award.

Under RCW 62A.2-601, if a seller delivers non-conforming goods, the buyer has the statutory right to reject those goods in whole or in part. Additionally, even after acceptance, a buyer may revoke acceptance when a nonconformity substantially impairs the value of the goods to that buyer. RCW 62A.2-608(1). A buyer who revokes has the same rights with regard to the goods as if it had rejected them. RCW 62A.2-608(3). Once the buyer rejects nonconforming goods or revokes its acceptance of them, it must hold the goods to permit the seller to remove them. RCW 62A.2-602(2)(b). If the seller fails to give instructions regarding how to return the goods, the buyer may store them or ship them to the seller, at the seller's expense. RCW 62A.2-604.

The buyer may also recover as damages "the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable." RCW 62A.2-714(1). In a "proper case," incidental and consequential damages may also be recovered. RCW 62A.2-714(3). Under RCW 62A.2-715, incidental damages may include "expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected, . . . and any other reasonable expense incident to the delay or other breach." Costs incurred to transport and dispose of the nonconforming goods are therefore recoverable under the UCC.

The record supports the award of these costs to Moraglis. Konstantinos testified that

> Moraglis was then forced to obtain replacement tires from another manufacturer, at great expense, and retrieve the nonconforming tires from their end client and have them recycled as no one in Europe would

18

purchase them. The cost of transport and recycling of the tires was $5,612.59.

This evidence supports a finding that the cost of transporting and recycling the tires is a recoverable incidental damage under RCW 62A.2-715. We affirm the award of these damages.

### 3. Prejudgment Interest

CTC next argues that there is insufficient evidence in the record to support the trial court's calculation of prejudgment interest. We agree.

We review a prejudgment interest award for abuse of discretion. *Crest, Inc. v. Costco Wholesale Corp.*, 128 Wn. App. 760, 775, 115 P.3d 349 (2005). Prejudgment interest is permitted "when a party to the litigation retains funds rightfully belonging to another and the amount of the funds at issue is liquidated, that is, the amount at issue can be calculated with precision and without reliance on opinion or discretion." *Id*.

First, because we affirm the award of the purchase price and recycling costs, but reverse the award of port charges, the prejudgment award must be recomputed to reflect this fact.

Second, CTC does not contend that Moraglis's claim is unliquidated or that Moraglis is not entitled to some amount of prejudgment interest.[11] It disputes, however, the period of time subject to this interest. Prejudgment interest awards are based on the principle that a defendant who retains money belonging to another should be charged interest thereon. *McLelland v. Paxton*, 11 Wn. App. 2d 181, 220, 453 P.3d 1 (2019). The

---

[11] Nor does CTC challenge the applicable rate. Under RCW 19.52.010(1), when parties have not agreed in writing to another interest rate, the default interest rate is 12 percent per annum. This statutory rate applies to both prejudgment and postjudgment interest. *TJ Landco, LLC v. Harley C. Douglass, Inc.*, 186 Wn. App. 249, 256, 346 P.3d 777 (2015) (RCW 4.56.110, the postjudgment interest statute, relies on the rate set out in RCW 19.52.010).

law affords the plaintiff compensation for the use value of the money representing its damages for the period of time from its loss to the date of judgment. *Id.* Generally, under the UCC, prejudgment interest is awarded from the date of breach by a seller. *Egerer v. CSR West, LLC*, 116 Wn. App. 645, 656, 67 P.3d 1128 (2003). Interest is not payable for non-performance until performance is due. RESTATEMENT (SECOND) OF CONTRACTS § 354 cmt. b. (AM. LAW INST. 1981).

We cannot determine from this record how the trial court computed prejudgment interest. When it signed Moraglis's proposed judgment and awarded prejudgment interest of $42,451.18, it did not explain what period of time it included in the award. Moraglis also failed to identify the date it selected to begin its computation of prejudgment interest.

CTC argues that prejudgment interest should begin to run no earlier than May 11, 2020, the date it delivered the final shipment of tires to Moraglis. Moraglis did present evidence that it received the nonconforming tires in Greece on May 11, 2020. But we cannot determine, based on the record, if that is the date performance was due. While Konstantinos testified that the contract stated that the "tires would be delivered within 30 to 90 days" of its payment in late December 2019, the copy of the "Sales Confirmation" that Moraglis presented to the trial court states that the tires would be "ready for the 1st shipment in 30-90 days after CTC's receipt of prepayment." We note that Hengyucius produced a version of the contract that differed from the one submitted by Moraglis. His version contains a handwritten note at the bottom that reads: "Clarification: Whole quantity of 2.200 pieces will be delivered in 30-90 days." This evidence would, if considered below, support Moraglis's delivery deadline and support an earlier award of

prejudgment interest. But that is not the version of the agreement Moraglis presented to the trial court. There remain issues of fact as to when CTC's performance was actually due and thus an issue of fact for the court to resolve as to when prejudgment interest began to accrue.

Because the record is insufficient to sustain the award of port charges, thereby reducing the monetary award to Moraglis, at least on summary judgment, and because we cannot determine the date CTC's performance was due, we reverse the award of prejudgment interest and remand for the trial court's consideration of this issue.

<u>Summary Judgment Against Hengyucius</u>

CTC next argues that summary judgment was improper as to its president, Hengyucius, because Moraglis did not adequately show grounds for individual liability in this case. We agree.

Although Moraglis's initial motion did not specify which claims it was pursuing against Hengyucius and on what legal theories, it did seek summary judgment as to all "causes of action in the complaint." In the complaint, Moraglis alleged that both CTC and Hengyucius committed conversion, fraud, and negligent misrepresentation. As a matter of law, however, Moraglis presented insufficient evidence to sustain a judgment against Hengyucius for conversion, negligent misrepresentation, or fraud. We therefore reverse the judgment against Hengyucius and remand these claims for further proceedings.

A. <u>Conversion</u>

Moraglis argues on appeal that Hengyucius is personally liable for CTC's conversion of the purchase price. But the evidence does not support a finding of liability

against Hengyucius for conversion because Moraglis failed to present evidence that it demanded a return of the purchase price before it initiated this lawsuit.

To establish a claim of conversion, a plaintiff must prove (1) willful interference with chattel belonging to the plaintiff, (2) by either taking or unlawful retention, and (3) thereby depriving the owner of possession. *Burton v. City of Spokane*, 16 Wn. App. 2d 769, 773, 482 P.3d 968 (2021). Wrongful intent is not an element of conversion and good faith is not a defense. *Id.* "A bailee who, on demand, refuses to return property to its owner is liable for conversion." *Id.* (citing RESTATEMENT (FIRST) OF TORTS § 237 (AM. LAW INST. 1934)).

Money may become the subject of conversion if the party that received it had an obligation to return it to the party claiming it. *Consulting Overseas Mgmt., Ltd. v. Shtikel*, 105 Wn. App. 80, 83, 18 P.3d 1144 (2001). A corporate officer may be personally liable for conversion by the corporation if that officer "actively participated in the conversion of plaintiff's property." *Id.* at 84. " 'Where the officer performs an act or a series of acts which would amount to conversion if he acted for himself alone, he is personally liable, even though the acts were performed for the benefit of his principal and without profit to himself personally.' " *Id.* (quoting *Dodson v. Econ. Equip. Co.*, 188 Wash. 340, 343, 62 P.2d 708 (1936)).

But in general, when the property at issue is conveyed to another with the consent of the owner, a conversion does not occur until the owner makes a demand for the return of the property and that demand is refused, or unless circumstances show that a demand would have been futile. *Persson v. McKay Coal Co.*, 200 Wash. 75, 77, 92 P.2d 1108 (1939); *Lockit Cap Co. v. Globe Mfg. Co.*, 158 Wash. 183, 188, 290 P. 813 (1930).

There is no question that Hengyucius requested payment of the purchase price from Moraglis, received the sale proceeds, and, as CTC president, would have been in a position to refund the funds to Moraglis. But Moraglis presented no evidence that it demanded a refund or that such a demand would have been futile. Konstantinos testified that "Moraglis has sent numerous emails to Defendants requesting that they reimburse Moraglis for the port and customs fees and that Defendants arrange to take the tires back and replace them with the proper tires as contracted. Defendants failed to respond to any of the demands." This evidence shows Moraglis repeatedly asked CTC to replace the tires, but we find no evidence it requested a refund of the purchase price until it initiated this lawsuit. Because issues of fact exist as to whether Moraglis demanded that Hengyucius refund its purchase price or whether such a demand would have been futile, we reverse any conversion-based judgment against Hengyucius.

B. Negligent Misrepresentation and Fraud

Moraglis also argues Hengyucius is personally liable under a theory of negligent misrepresentation and fraud. We disagree because the representations on which Moraglis relied for these claims are not actionable statements of existing fact, but are instead promises of future conduct.

To prove fraud or negligent misrepresentation, a party must prove that the defendant made a misrepresentation of existing fact. *Glacier Nw., Inc. v. Int'l Bhd. of Teamsters Local Union No. 174*, 198 Wn.2d 768, 800, 500 P.3d 119 (2021). A promise of future performance is not an actionable statement. *Id.*

Here, Konstantinos described CTC's misrepresentations in the conditional future tense:

> CTC through Mr. Hengyucius assured us that the tires we wanted to purchase for our client in Europe would be manufactured and shipped from the United States, that an ECE certificate would accompany the shipment of tires, and that he and his company would be shipping 235/85R16 tires for use on small trucks in front and back axles.

These assurances or representations were promises of future performance under what later became the parties' contract. This testimony is insufficient to sustain judgment against Hengyucius for either negligent misrepresentation or fraud. We cannot affirm the judgment against Hengyucius on this alternative basis.

CONCLUSION

We affirm the trial court's orders denying CTC's CR 56(f) motion, denying its motion for reconsideration, and granting summary judgment against CTC for breach of the sales contract based on its delivery of non-conforming goods. We also affirm the award of the purchase price and recycling costs to Moraglis. We reverse the award of port charges against CTC and the summary judgment against Hengyucius. We remand to the trial court to revise the judgment against CTC, to recompute prejudgment interest, and to resolve by dispositive motion or trial Moraglis's remaining claims against CTC and Hengyucius.

_Andrus, C.J._

WE CONCUR:

_Chung, J._

_Bruman, J._